[Cite as *In re G.B.*, 2024-Ohio-5528.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
HURON COUNTY

In re G.B., K.H.

Court of Appeals Nos.  S-24-002
S-24-003

Trial Court Nos.  JC22230147
JC22230148

**DECISION AND JUDGMENT**

Decided:  November 22, 2024

* * * * *

Dean Ross, for appellee, SCDJFS

Corey J. Speweik, for appellee, Kari Shull.

Laurel A. Kendall, for appellant.

* * * * *

**SULEK, P.J.**

{¶ 1} In this consolidated appeal, appellant, J.B. (grandmother), appeals from the January 9, 2024 judgment of the Sandusky County Common Pleas Court, Juvenile Division denying her motions for legal custody of her grandchildren, G.B. and K.H., and instead granting legal custody to their respective former temporary custodians.  For the following reasons, the trial court's judgment is affirmed.

## I. Facts and Procedural History

{¶ 2} G.B., born in June 2012, and K.H., born in March 2021, are cousins. G.B.'s mother, A.F., and K.H.'s mother, T.F., were sisters and were grandmother's daughters.[1] Both A.F. and T.F. had significant histories of substance abuse, and both died because of their substance abuse. T.F. died before the filing of this case, and A.F. died in December 2022, during this case's pendency.

{¶ 3} Prior to the filing of the instant cases, grandmother had legal custody of both G.B. and K.H. Grandmother was granted legal custody of G.B. sometime in 2012 or 2013 and K.H. in December 2021. When this case was initiated, grandmother and the two children resided with Sarah and Ken Auxter, grandmother's other daughter and son-in-law.

### A. Agency Complaint in Dependency and Neglect

{¶ 4} On September 1, 2022, appellee, the Sandusky County Department of Job and Family Services (the agency), filed separate complaints regarding G.B. and K.H., each asserting that the respective child was neglected and dependent. With respect to G.B., the agency requested legal custody be modified from grandmother to the temporary custody of Lorna (Doreen) Kramer under the agency's protective supervision. Similarly,

---

[1] K.H.'s father, R.H., could not be located and never contacted the agency about the case. Although G.B.'s father, M.B., was appointed counsel and appeared by telephone at hearings in October and November 2022, M.B. made no motions or otherwise took any action in response to the motions made by other parties in the proceedings, did not appear at later hearings, and his appointed counsel reported that she could not locate him.

2.

as to K.H., the agency requested that legal custody be modified from grandmother to the temporary custody of Kari Shull under the protective supervision of the agency.

{¶ 5} Both complaints alleged that on July 25, 2022, the agency received a referral regarding the children. According to the allegations in the referral, grandmother was leaving the children under the supervision of G.B.'s mother, despite her history of substance abuse, for extended periods. In addition, the referral reported that G.B. had been drinking alcohol, set a propane tank on fire, and drove with K.H., who was then only a year old, on an ATV without a helmet.

{¶ 6} The complaints alleged that the agency's investigation substantiated many of the allegations in the referral. Also, according to the complaints, investigators learned that grandmother's boyfriend, Greg Cessna, with whom grandmother had been in a relationship for the previous 10 months, was a registered sex offender and had been convicted of rape, gross sexual imposition, and corruption of a minor. Accordingly, the agency would not agree to the children residing with grandmother, and grandmother assisted in finding temporary placements of the children. K.H. was living with Kari Shull and G.B. was living with Lorna Kramer.

## B. Trial Court Proceedings during Temporary Custody Placements

{¶ 7} An initial hearing was held on September 28, 2022, at which time the agency filed case plans. All parties consented to the placement of G.B. in the interim temporary custody of Kramer, and the juvenile court found that it was in the best interest of K.H. to be placed in the interim temporary custody of Shull. The court granted grandmother

3.

supervised visitation weekly at an agency-approved location and permitted her to attend G.B.'s sports games. It also granted G.B.'s mother granted supervised visitation.

{¶ 8} On November 3, 2022, grandmother filed motions for legal custody of the children.

{¶ 9} On November 18, 2022, the juvenile court held a combined adjudicatory and dispositional hearing. At the hearing, the parties admitted to the allegations in the complaint, consented to the finding of the children's dependency, and consented to the temporary custody of G.B. to Kramer and K.H. to Shull, both under the protective supervision of the agency. The agency withdrew the allegation of neglect. The court continued grandmother's motions for legal custody and maintained the same visitation for grandmother.

{¶ 10} On February 15, 2023, grandmother again filed a motion for legal custody of both K.H. and G.B. Shortly thereafter, Kramer filed a motion for legal custody of G.B., and Shull filed a motion for legal custody of K.H.

## C. Dispositional Hearings on Motions for Legal Custody

{¶ 11} The juvenile court held a dispositional hearing for all motions for legal custody on May 18, 2023 and July 26, 2023. A summary of the hearing testimony is as follows.

### 1. The Children's History with Grandmother

{¶ 12} Grandmother testified that she had a long history of being the primary caretaker for both children. G.B. began staying with grandmother in 2012 when he was only three days old, coming home from the hospital to live with her, and grandmother

4.

obtained legal custody within a year of G.B.'s birth. Similarly, grandmother had custody of K.H. beginning when he was an infant. She got temporary custody of him in May 2021, when K.H. was only a few months old, and got legal custody of K.H. in December 2021. Grandmother explained that the mothers of G.B. and K.H. both had significant histories of drug abuse and were not stable.

{¶ 13} Grandmother was a widow, and her former husband died approximately four or five years before this case was initiated. The home they lived in during their marriage was not habitable. Grandmother testified that she was working on fixing it up, but she did not have title to the home because there continued to be probate issues with her late husband's estate. Accordingly, grandmother and the children lived with Sarah, and Sarah's husband, Ken Auxter, at the time the case was initiated.

## 2. Agency Investigation

{¶ 14} Leslie Adams was the agency investigator who responded to the referral in July 2022. During her investigation, Adams observed that grandmother's interactions with the children were very positive, the children appeared safe and clean, and the children were bonded to grandmother. Adams, however, developed several concerns following her interviews with grandmother, G.B., and G.B.'s mother. Both Adams and grandmother testified about these concerns.

### Children Left Unsupervised with A.F.

{¶ 15} Adams was concerned about grandmother leaving the children with G.B.'s mother, A.F., several times, including overnight stays, during a period beginning January or February 2022, despite A.F.'s history of drug abuse and trouble maintaining sobriety.

5.

Grandmother maintained that due to her experience with A.F.'s drug use, she could determine whether A.F. had been using drugs, and she never left the children with A.F. when A.F. was demonstrating signs of having used drugs.

{¶ 16} However, A.F. was in rehab multiple times during that same period, including a hospitalization for a suicide attempt, and grandmother showed Adams text messages that A.F. sent when the children were staying with A.F. that indicated A.F. was likely under the influence of drugs. Grandmother also reported that on one occasion after she dropped off the children with A.F., A.F.'s drug dealers followed grandmother, making her feel threatened, but she nonetheless left the children in A.F.'s care.

### *Concerns about Domestic Violence and Alcohol Abuse in the Home Environment*

{¶ 17} Next, Adams expressed concerns about the children's home environment, citing G.B.'s report of a domestic violence incident between Ken and Sarah, the individuals that grandmother had been living with. G.B. told Adams that during that incident, Ken "had ahold of Sarah, either on the shoulders or up by her neck, and that [G.B] had tried to intervene … to split it up." Adams also was concerned about Ken's drinking problem—when G.B.'s younger sister, L.F., was in Ken and Sarah's custody, Ken was not allowed to be with L.F. unsupervised at least in part due to his drinking problem—and Adams observed empty beer cans and liquor bottles throughout the home.

{¶ 18} Grandmother admitted that Ken and Sarah were using some physical force or pushing at the time G.B. intervened, but she did not consider it to be serious or domestic violence. Grandmother also admitted that G.B. had taken a sip of Ken's beer, but she denied that G.B. was regularly drinking alcohol.

6.

### Sexual Abuse Allegations

{¶ 19} Numerous allegations of sexual abuse were discussed during the hearing, including allegations regarding G.B.'s younger sister, L.F. Grandmother testified that L.F. was removed from the custody of her mother, A.F., due to concerns that L.F. had been sexually abused by A.F.'s boyfriend. L.F. then lived with Sarah and Ken. In 2019—just before grandmother, G.B., and K.H., moved in with Sarah and Ken—the agency investigated a complaint that Ken sexually abused L.F. Grandmother claimed that the complaint came from A.F., asserting that A.F. often made false claims of sexual abuse, and grandmother insisted that Ken had been cleared of the allegations. Grandmother admitted, however, that L.F. was never returned to the custody of Ken and Sarah following the investigation, and L.F. instead lived with a different family member. Further, Adams testified she spoke with grandmother about why G.B. should not be left alone with Ken due to his alcohol abuse and being an indicated sexual abuser of L.F.

{¶ 20} At the time of the hearing, a law enforcement investigation was open regarding alleged sexual abuse of G.B. that was reported to occur while G.B. was living with grandmother in Ken and Sarah's home, and G.B. had been interviewed at school as part of the investigation. Grandmother explained that she was not told the identity of the alleged abuser, but she nevertheless maintained that the allegations were unsubstantiated.

### Grandmother's Relationship with Cessna

{¶ 21} Next, grandmother admitted that she dated Cessna, a registered sex offender who had been convicted of rape and other crimes involving a minor, for the ten months preceding the agency's involvement in this case. Grandmother denied being

7.

aware of Cessna's criminal history while they were in a romantic relationship, explaining that it had been her first romantic relationship after her late husband's death and she had not known to check Cessna's criminal history. She testified that the children spent time with Cessna on approximately four or five occasions, but she denied ever leaving the children alone with him. She claimed she immediately ceased her romantic relationship with him when she was informed of his history.

{¶ 22} Grandmother, however, continued to maintain a friendly relationship with Cessna well after she learned of his background. She acknowledged speaking to him the night before the May 18th hearing. Grandmother expressed her belief that people could change and that the children could be safe around Cessna despite his history, testifying as follows:

> Q. I mean, I – I'm asking – my question is is, going forward, do you – even knowing, even knowing that, knowing the offense and knowing that you believe people can be reformed and changed, do you believe he would be an appropriate person to have around your minor children that are in your custody should you win this case?
> A. With supervision.
> Q. You think that would be appropriate?
> A. I would – that's what I would feel comfortable with.

### Safety Incidents – Tree Stump Fire and Minibike

{¶ 23} Next, grandmother addressed the agency's allegations regarding the tree stump fire and minibike. Grandmother admitted that both incidents occurred, but she maintained that neither incident presented any safety risks to the children. As to the tree stump, grandmother explained that Ken had been attempting to remove old tree stumps from his property, and G.B., who was 9 years old at the time, wanted to help. On the date

8.

G.B. set fire to the tree stump, grandmother saw G.B get a lighter and go outside. G.B. did not have any supervision outside, but grandmother said that she could keep an eye on G.B. from inside the house. G.B. set fire to a tree stump that was directly under a propane tank, and Adams reported that a neighbor who was in fear of his own safety contacted the authorities about the fire.

{¶ 24} Adams was concerned that grandmother did not consider G.B. lighting a tree stump on fire without any immediate supervision to be a safety risk. Indeed, during her testimony, grandmother refused to admit that permitting G.B. to set fire to a tree stump without direct supervision was unsafe, insisting that G.B.'s Boy Scout training made it safe.

{¶ 25} Next, grandmother asserted that the minibike incident was much less serious than characterized in the complaint. She stated that the bike at issue was a two-wheel electric minibike that could only go up to seven miles per hour. She admitted that G.B. rode the bike with K.H., who was only a year old at the time, and that neither child wore a helmet, but she insisted that G.B. was a very good driver. Again, Adams expressed concern that grandmother did not consider G.B. driving a one-year-old child around on a minibike, without a helmet, to be a safety risk.

### Children's Medical Care

{¶ 26} Regarding K.H.'s medical care, Adams testified that K.H. had not been to the doctor for at least six months before her investigation began. Because of K.H.'s young age, he required at least one or two well checks during that period, so he had missed at least some of his medical appointments, and he had not received his scheduled

9.

vaccinations. Similarly, grandmother had never taken G.B., who was 9 years old at the time of his removal, to a dentist.

{¶ 27} Grandmother maintained that the children were healthy while in her care. She also claimed that she decided against having K.H. vaccinated due to her concerns about substances he may have been exposed to while his mother was pregnant with him. She admitted, however, that she had never taken G.B. to a dentist. She also admitted that as a nurse, she knew that dental problems could lead to heart issues.

*Grandmother's Prescription Drug Use*

{¶ 28} As to grandmother's own health, she testified that she suffered from a painful degenerative joint disease. Grandmother could no longer work due to the pain, and she regularly took 13 to 14 prescription medications, including multiple narcotic painkillers. Grandmother considered herself capable of driving even when she took narcotic painkillers, explaining that she had years of experience taking the medications and she usually only took the medications in the evening when she did not need to drive.

**3. Progress Under the Case Plans**

{¶ 29} Kristen LeFene, the agency caseworker who was assigned to the children's cases, testified regarding the progress that the children and grandmother had made on their case plans, which were created with reunification between the children and grandmother as their goal. In addition, grandmother testified regarding her own progress, and the children's temporary guardians, Kari Shull and Lorna Kramer, testified regarding the children's experiences in their custody.

10.

### Grandmother's Case Plan Progress

{¶ 30} As to grandmother, the case plans called for case management, a medication evaluation, mental health counseling, education, and stable housing. Grandmother met several of these goals. She completed her medication evaluation and a 6-week parenting program. LeFene also reported that grandmother's weekly visits with the children went well. Grandmother signed all releases of information and followed her service provider recommendations.

{¶ 31} Grandmother also obtained a mental health assessment and continued in counseling with Patty Hall from Lutheran Social Services. She attended weekly counseling sessions and made some improvements in her coping skills. Hall, however, testified as to grandmother's relationship with Cessna as follows:

> Q. Okay. And in your working with [grandmother], has she discussed a person by the name of Greg Cessna?
> A. We have spoken about him, yes.
> Q. And you're aware he's a registered sex offender, convicted felon for sex offenses against youth; is that correct?
> A. I'm aware of some of that.
> Q. Okay. Would you be surprised to hear that she still thinks it's appropriate to put the children around this person?
> A. Yes.

Therefore, the agency was concerned that grandmother was withholding relevant facts, such as grandmother's ongoing relationship with Cessna and grandmother's belief that the children could have supervised contact with Cessna, in her counseling sessions with Hall, which would make her counseling sessions out of compliance with grandmother's case plan. LeFene also pointed out that grandmother continued to need counseling according to Hall.

11.

{¶ 32} Moreover, LeFene explained that a client's completion of services identified by a case plan is insufficient if the client does not also make behavioral changes. Indeed, even after grandmother's completion of parenting classes and regular attendance at counseling sessions, LeFene remained unsure about grandmother's "ability to decide … who is and who is not appropriate to be around the children." In support, LeFene pointed to Grandmother's insistence that the children could continue to have supervised contact with Cessna. In addition, LeFene personally worked on the case involving L.F., G.B.'s younger sister, when L.F. was removed from Ken and Sarah's home, and she found it concerning that grandmother moved K.H. and G.B into Sarah and Ken's home after L.F. had been removed from Ken and Sarah's care.

{¶ 33} LeFene also expressed concern about grandmother's recent drug test results. Grandmother successfully passed her drug screens until just before the May 18th hearing, when grandmother gave a sample while at the agency visiting the children. The test results included a note that grandmother's level for Tramadol, an opioid pain medication, was approximately 2600 nanograms per milliliter, over one hundred times the therapeutic level identified by the testing laboratory. In addition, grandmother tested positive for hydrocodone, another opioid pain medication for which grandmother had a prescription. LeFene noted that grandmother drove to the agency for the visitation. Based on these results, LeFene concluded that grandmother would need to be referred for a drug and alcohol assessment.

{¶ 34} Finally, as to stable housing, at the May 18th hearing, grandmother testified that although she had not yet secured independent housing suitable for children, she was

12.

planning to sign a lease for an apartment in a community for residents of ages 55 and over that also permitted children. Also at the May 18th hearing, LeFene expressed concern that in the eight months since the case was initiated grandmother still had not secured independent housing. At the July 26th hearing, grandmother confirmed that she signed a lease in late May. LeFene testified that when she visited grandmother's apartment in late June, she observed limited furniture, including a chaise lounge bed for G.B. The apartment did not contain living room furniture or a crib for K.H., and it was not childproofed.

### G.B.'s Case Plan Progress and Experience in Temporary Placement

{¶ 35} Next, Kramer testified G.B. was doing well in her custody and that G.B. told her he wanted to continue living with her. Kramer explained that she had known G.B. his whole life and had babysat him from the time he was a baby.

{¶ 36} G.B.'s case plan called for case management, addressing his basic and medical needs, continuing his extracurricular activities, and individual counseling. LeFene testified that Kramer was meeting G.B.'s medical and basic needs. In addition, since moving in with Kramer, G.B. learned how to properly perform basic hygiene tasks such as brushing his teeth and bathing, which he did not know how to do before.

{¶ 37} For extracurricular activities, G.B. played baseball, enjoyed tending to gardens at Kramer's home, and volunteered at a food pantry. As to G.B.'s schooling, Kramer explained that G.B. had a learning disability and was on an Individualized Education Plan, but he had advanced academically while in her care and was on the honor roll.

13.

{¶ 38} As for G.B.'s mental health, LeFene reported that G.B. had an inpatient stay at a mental health facility from March 31, 2023 to April 10, 2023. G.B. had also been speaking to his school counselor, and he had an upcoming appointment with a mental health professional. LeFene was concerned, however, that G.B. was not receiving consistent mental health counseling.

{¶ 39} Kramer acknowledged that G.B. still had serious mental health issues, which she opined were getting better but still needed to be addressed with a therapist. Kramer attributed some of G.B.'s recent distress to grandmother, claiming that his recent mental health inpatient stay occurred after G.B.'s mother's funeral, at which grandmother promised G.B. she was going to get an apartment and move G.B. back in with her. Kramer noted that multiple health care providers, including a child abuse specialist, had informed her that G.B. may have been sexually abused in the past based on his behavior.

{¶ 40} Finally, LeFene noted a concern that Kramer may have promised certain items to G.B. if he told the magistrate that he wanted to live with her during his in-camera interview.

### K.H.'s Case Plan Progress

{¶ 41} Next, Shull and LeFene testified regarding K.H.'s progress in Shull's care. K.H.'s case plan called for case management, addressing K.H.'s basic and medical needs, and Help Me Grow services. LeFene testified that these items were all being addressed. Shull had taken K.H. to multiple pediatrician appointments, updated K.H.'s vaccinations, and taken K.H. to an eye specialist and a urologist to address specific medical issues.

14.

K.H. was meeting his milestones, seeing Help Me Grow specialists regularly, and had recently experienced a significant improvement in his speech.

{¶ 42} Overall, Shull emphasized that K.H. was happy and adjusted well to the family's routines. Shull testified, however, that K.H. acted out after visits with Grandmother and G.B.

### 4. Recommendations for Custody

{¶ 43} At the hearing, both the agency and Mark King, the children's guardian ad litem, presented recommendations as to the children's custody.

*Guardian Ad Litem's Recommendations*

{¶ 44} Throughout the case's pendency, King continued to have the same concerns. These concerns included that the children's relationship with grandmother may be unstable but possibly improving, particularly with respect to G.B.; the past incidents of physical, sexual, and emotional abuse in the children's living environment; grandmother's history of enabling an alleged abusive environment; grandmother's lack of a suitable living arrangement; and grandmother's relationship with a registered sex offender. King noted, however, that he observed grandmother acting appropriately at her visits with the children when he attended.

{¶ 45} King recommended that the juvenile court grant Shull legal custody of K.H. with the termination of the agency's protective supervision. He explained that Shull's home was stable and clean, and Shull provided a very loving atmosphere. King observed several positive interactions between Shull and K.H. during his visits and in the community. In addition, Shull prioritized addressing K.H.'s medical needs.

15.

**{¶ 46}** As to G.B., King's recommendation changed between the two hearing dates. At the May 18th hearing, King initially recommended that G.B. remain in the temporary custody of Kramer with grandmother having supervised visitation and the agency continuing its protective supervision. In recommending that G.B. remain in Kramer's custody, King opined that G.B. should not be moved to a different home environment while G.B. was experiencing significant mental health issues and during an ongoing law enforcement investigation into whether G.B. had been sexually abused. Kramer provided a safe, clean, and stable home for G.B., Kramer had taken G.B. to some medical appointments, and G.B. had improved his school performance while living with Kramer.

**{¶ 47}** King did not recommend Kramer have legal custody, however, due to King's concerns about G.B.'s placement with Kramer. First, King questioned whether G.B. had enough extracurricular or social engagement outside of school. Second, he suspected Kramer and grandmother were using G.B. against each other. Most importantly, King was concerned that G.B. was not receiving sufficient mental health treatment. G.B.'s pediatrician said that counseling was "extremely important" for G.B., and over a month had passed since G.B.'s inpatient mental health stay without any follow-up treatment.

**{¶ 48}** At the July 26th hearing date, King changed his recommendation as to G.B. He testified that he no longer opposed Kramer obtaining legal custody of G.B. King explained that since May, G.B. had been receiving more significant mental health counseling, and G.B. had told King that he wanted to live with Kramer.

16.

{¶ 49} Based on the case plans and the agency's outstanding concerns, the agency opposed grandmother's motion for legal custody of either G.B. or K.H.  As to G.B., the agency advocated against the juvenile court granting legal custody to Kramer as well. Instead, the agency maintained that G.B. should remain in Kramer's temporary custody under the agency's protective supervision.  As to K.H., the agency expressed no preference between K.H. remaining in the temporary custody of Shull under the agency's protective supervision and the court granting Shull legal custody of K.H.

### D.  Magistrate's Decision and Trial Court's Order

{¶ 50} On August 2, 2024, the magistrate issued a decision finding that it was in G.B.'s best interest and welfare to be placed in the legal custody of Kramer and not to be returned to grandmother's home, and it was in K.H.'s best interest and welfare to be placed in the legal custody of Shull and not to be returned to grandmother's home.  In support, the magistrate made numerous findings of fact and conclusions of law.

{¶ 51} While the magistrate found that grandmother had a close relationship with the children, cooperated with the agency, and completed all but one of her case plan requirements, she pointed to several factors that weighed against awarding grandmother legal custody. These included grandmother's failure to obtain suitable, stable housing, and that her counselor "appeared to be shocked" to learn that grandmother still had some relationship with Cessna. The magistrate also noted that grandmother's drug test results indicated that she had above therapeutic levels of one of her narcotic painkillers.

17.

**{¶ 52}** Moreover, the magistrate concluded that grandmother had "repeatedly placed the children in harm's way by some of her conduct during the time she had custody of the children." The magistrate cited several examples, including grandmother leaving the children unsupervised with G.B.'s mother; continuing to have "some relationship with a registered sex offender;" living with Sarah and Ken Auxter despite Ken's drinking problem and the accusations that Ken had sexually abused another of grandmother's grandchildren; permitting G.B. to light on fire a tree stump in close proximity to a propane tank; and permitting G.B. to drive K.H. around on a mini bike with no helmet. The magistrate also found that "notwithstanding many counseling sessions, drug testing, and parenting education," grandmother's issues remained unresolved, "primarily because [grandmother] does not view her own judgments and conduct as a problem and does not appear to comprehend what activities, exposures, or contacts with unsafe persons, constitute potential dangers for young children." The magistrate also pointed to grandmother's lack of "diligen[ce] about recognizing or meeting the routine or special medical needs or mental health needs of the children."

**{¶ 53}** Next, the magistrate reviewed the children's positive relationships with Kramer and Shull and the progress made in their homes. The magistrate cited the recommendations of King, the children's guardian ad litem, that the children's best interests would be best served by granting legal custody of K.H. to Shull and legal custody of G.B. to Kramer. Finally, the magistrate noted that during her in-camera interview of G.B., G.B. said he wanted to live with Kramer and did not wish to see Grandmother more frequently.

18.

**{¶ 54}** The juvenile court adopted the magistrate's decision denying grandmother's pending motions for legal custody, granting Shull's motion for legal custody of K.H., granting Kramer's motion for legal custody of K.H., and terminating the agency's protective supervision. In addition, the order granted grandmother monthly supervised visitation for two to four hours with each child to be supervised by their legal custodian.

**{¶ 55}** Grandmother filed objections to the magistrate's decision, all ten of which contested factual findings made by the magistrate. The agency filed a response to the objections. In addition to countering each of grandmother's factual objections, the agency argued that the hearing testimony demonstrated that grandmother repeatedly failed to recognize and protect the children from safety concerns and unsafe people.

**{¶ 56}** The trial court denied grandmother's objections and upheld the magistrate's decision. In support, the court explained that the magistrate was in the best position to evaluate the arguments and weigh the witnesses' credibility. After reviewing the transcript, the court determined that none of the differences in the witnesses' testimony led to a different conclusion than the one reached by the magistrate, and the court therefore independently made the same findings of fact and conclusions of law as the magistrate.

19.

## II. Assignments of Error

{¶ 57} Grandmother timely appealed the trial court's judgment, asserting two assignments of error for review:

1. The trial court's decision to deny legal custody of both children to maternal grandmother was not based on the best interest of the children pursuant to a preponderance of evidence, when she previously held custody, and substantially completed all her case plan services.

2. In the alternative, the trial court's decision to award supervised parenting time once a month, for two to four hours, to said grandmother is arguably not based on competent, credible evidence, and is not in the best interest of the children.

## III. Law and Analysis

### A. Legal Custody

{¶ 58} An appellate court must affirm a trial court order granting legal custody unless the trial court abused its discretion. *In re H.H.*, 2024-Ohio-686, ¶ 64 (6th Dist.). Accordingly, the trial court's judgment must be affirmed unless the ruling was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 59} In determining whether to award legal custody of a child to a nonparent, a trial must consider the child's best interest. *In re. K.S.*, 2022-Ohio-2810, ¶ 19 (6th Dist.). Specifically, the court "'may award legal custody to a nonparent upon a demonstration by a preponderance of the evidence that granting legal custody to the nonparent is in the child's best interest.'" *In re D.E.*, 2018-Ohio-3341, ¶ 53 (12th Dist.), quoting *In re C.A.*, 2015-Ohio-1410, ¶ 13 (12th Dist.).

20.

{¶ 60} To determine a child's best interest, a trial court may consider the factors set forth in R.C. 2151.414(D), R.C. 3109.04(F)(1), "'a combination of the two, or general notions of what should be considered regarding the best interests of the child.'" *In re H.H.* at ¶ 67, quoting *In re. K.S.* at ¶ 19.

{¶ 61} Grandmother points to three best-interest factors—the children's relationship with her, her long history of custody of both children, and their need for a legally secure placement—in arguing that the trial court abused its discretion in denying her motions for legal custody. She further maintains that the sexual abuse allegations against Ken involving L.F. were unsubstantiated—despite the agency's involvement in the removal of L.F. from his custody—because he was not criminally charged for the abuse. In addition, grandmother contends the sexual abuse allegations against Ken involving G.B. had not been substantiated in the ongoing law enforcement investigation, Cessna did not abuse any of grandmother's grandchildren and was not left unsupervised with them, and grandmother had good reasons to support her belief that G.B. could safely light a tree stump on fire and ride an electric minibike with a toddler without helmets.

{¶ 62} Upon review, this court cannot say that the trial court's decision was unreasonable, arbitrary, or unconscionable. The juvenile court expressly considered many factors in determining the children's best interests, including grandmother's completion of most of her case plan services and grandmother's strong bond with the children. Nonetheless, the trial court found the factors in favor of placement with grandmother were outweighed by a number of other factors, including grandmother's failure to demonstrate appropriate, stable housing and the guardian ad litem's

21.

recommendations. Most importantly, the juvenile court pointed to grandmother's failure to prevent or even recognize the children's exposure to several significant safety risks while in her custody, including grandmother's willingness to permit contact with a convicted sex offender whose crimes involved minors, her choice to live with a person whom the agency had previously identified as an abuser of grandmother's other grandchild and who had a known drinking problem, her failure to address the children's medical needs, and her judgment in leaving the children unsupervised with A.F., who had a significant substance abuse problem.

{¶ 63} Based on the foregoing, the trial court did not err in holding that it was in the best interest of G.B. and K.H. to deny grandmother's motion for legal custody. Grandmother's first assignment of error is found not well-taken.

### B. Visitation

{¶ 64} In her next assignment of error, grandmother argues that the trial court's decision awarding grandmother supervised monthly visitation with the children was not based on competent, credible evidence and that it was not in the best interests of the children. Citing R.C. 3109.051, and specifically her long relationship with the children as a "mother figure" and her bond with the children, grandmother argues that the children's best interests would be served by visitation with grandmother every other weekend as well as time during the week.

{¶ 65} An appellate court reviews a trial court's award of non-parent visitation for an abuse of discretion. *Wentz v. Wideman*, 2021-Ohio-2257, ¶ 12 (6th Dist.). Thus, this court must affirm the trial court's award of visitation to grandmother unless the trial

22.

court's ruling was "unreasonable, arbitrary, or unconscionable." *Blakemore*, 5 Ohio St.3d at 219.

{¶ 66} In considering whether to grant visitation rights to a grandparent, a trial court must "'determine whether such grandparent visitation would be in the child's best interest after considering all relevant factors, including the factors listed in R.C. 3109.051(D).'" *In re A.M.*, 2022-Ohio-4305, ¶ 43 (6th Dist.), quoting *In re K.M.-B.*, 2015-Ohio-4626, ¶ 44 (6th Dist.). Relevant among these factors include the prior relationship of the child to the grandparent, the child's available time, the child's wishes and concerns expressed during any in-camera interview, and the child's health and safety. R.C. 3109.051(D).

{¶ 67} Again, following a review of the record, the juvenile court's decision was not unreasonable, arbitrary, or unconscionable. The court considered the children's bond with grandmother, but it also noted G.B.'s lack of any expressed desire to see his grandmother more frequently, inappropriate comments made by grandmother during a visitation, K.H.'s negative behavior following visits with grandmother, and the previously discussed safety risks to which the children were exposed while in grandmother's custody. Accordingly, grandmother's second assignment of error is found not well-taken.

23.

## IV. Conclusion

**{¶ 68}** For the foregoing reasons, the judgment of the Sandusky County Common Pleas Court, Juvenile Division is affirmed.  Grandmother is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.               _____
                                                    JUDGE

Gene A. Zmuda, J.

                                          _____
Charles E. Sulek, P.J.                         JUDGE
CONCUR.

                                          _____
                                                    JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.