[Cite as *In re Da.C.*, 2025-Ohio-5338.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re Da.C., H.C., De.C.
Court of Appeals Nos. L-25-00154
L-25-00155
L-25-00156
L-25-00157

Trial Court Nos. JC25303896
JC25304561
JC23292602

**DECISION AND JUDGMENT**

Decided: November 26, 2025

* * * * *

David Rudebock, for appellee.

Laurel Kendall, for appellants.

* * * * *

**SULEK, P.J.**

{¶ 1} In this consolidated appeal, appellants, K.W. (Mother) and D.W. (Grandmother) appeal the judgment of the Lucas County Court of Common Pleas, Juvenile Division, terminating Mother's parental rights, denying Grandmother's motion for legal custody, and awarding LCCS permanent custody of minor children Da.C., H.C., and De.C. For the reasons that follow, the juvenile court's judgment is affirmed.

**I. Facts and Procedural Background**

{¶ 2} Mother and D.C. (Father) are the parents of Da.C., born in 2016, H.C., born in 2017, and De.C., born in 2022. Grandmother is the children's maternal grandmother.

**{¶ 3}** On January 27, 2023, LCCS filed a complaint in dependency and neglect and moved the court for protective supervision of the children pending adjudication. LCCS' complaint alleged that on December 28, 2022, it received a referral from the Toledo Police Department regarding a domestic violence incident between Mother and Father where the two were arguing in front of the children. Father struck Mother after she "charged him" causing a bump on her head and he broke items in the home.

**{¶ 4}** The LCCS caseworker investigating the referral stated that she spoke with Mother who denied that the argument was physical, she stated that Father was drinking and playing loud music while she attempted to get their youngest child to sleep. She unplugged the Wi-Fi router to stop the music, and an argument ensued.

**{¶ 5}** Father was incarcerated at the time of the interview and the caseworker advised Mother not to let him back into the home upon his release. Mother failed to appear on his January 10, 2023 trial date and the State dismissed the case.

**{¶ 6}** The caseworker made several unsuccessful attempts at conducting announced and unannounced home visits. On January 25, the caseworker made an unannounced visit and found Father residing in the home. She discussed implementing a safety plan.

**{¶ 7}** On January 26, LCCS held a family case conference where Mother agreed to sign releases and engage in services, Father did not. LCCS had concerns regarding Father's history of violence and alcohol consumption.

2.

{¶ 8} The complaint requested that within 30 days the court find the children dependent and neglected, proceed to disposition, award LCCS protective supervision of the children, and order that Father vacate the family home.

{¶ 9} Following the shelter care hearing, the court awarded LCCS protective supervision of the children with Mother retaining custody, ordered that Father vacate the family home and have no contact with the children in Mother's presence, appointed a GAL for the children, and ordered that the parents complete a dual diagnostic assessment and follow all recommendations. At the subsequent adjudication hearing, the court entered a default judgment finding that the children were dependent and neglected. Mother and Father appeared approximately one hour after the hearing; the court granted their request that the disposition hearing be bifurcated. At the May 2, 2023 disposition hearing, the court awarded LCCS protective supervision of the children with Mother retaining custody and ordered Father to vacate the home.

{¶ 10} The family's case plan required that the two oldest children attend counseling and complete diagnostic assessments and the youngest be assessed by Help Me Grow. The plan provided that Mother attend a domestic violence survivors program, complete a dual diagnostic assessment and follow any treatment plans or recommendations.

{¶ 11} On December 4, 2023, LCCS moved to terminate protective supervision of the children based on the recommendation of the family's caseworker. The court denied the motion noting that Mother failed to attend counseling on multiple occasions but had recently "re-engaged" completing 2 of 17 domestic violence classes, that the older

3.

children were not going to counseling, and the youngest never received a developmental assessment as provided in the case plan.

{¶ 12} In April 2024, LCCS moved for an emergency change of disposition from protective supervision to interim temporary custody of the children based on reports that Father was residing in the home, that Da.C. and H.C. were dismissed from their counseling program due to too many absences, and that De.C. had yet to complete a developmental assessment. The court granted LCCS interim temporary custody of the children. At the June 28, 2024 motion hearing, Mother stipulated to the facts presented in the motion and agreed to the temporary custody change. The court awarded LCCS temporary custody and the children were placed with Grandmother. Father's whereabouts were unknown.

{¶ 13} On October 29, 2024, LCCS moved to terminate its temporary custody of the children. LCCS withdrew its motion and moved for permanent custody on November 20, 2024. The motion stated that on November 3, 2024, police charged Grandmother with child endangering after she left H.C. unattended in a vehicle in the Walmart parking lot for nearly half an hour. Though Mother reported the incident, LCCS later learned that Mother was also present with Grandmother. The children were removed from Grandmother and placed in foster care. Father began to engage in services.

{¶ 14} On February 12, 2025, Father moved for legal custody of the children. Grandmother moved for legal custody. Mother also filed various motions including a motion to reunify her and the children. Family friend Debbie S. filed a third-party complaint for custody.

4.

**The Permanent Custody Hearing**

{¶ 15} On April 8, 2025, May 2 and May 20, 2025, the court conducted a hearing on LCCS' permanent custody motion and related motions. LCCS presented the testimony of the foster parents, Oregon Police Officer Dana Kriner, the LCCS caseworker, Father, Erica Long, Mother, Debbie S., Zachary M., Grandmother, and Pamela D.

{¶ 16} The children's foster parents testified that in November 2024, LCCS placed the children in their home which is about three hours from Toledo. Da.C.'s behavior issues have greatly improved and he is on the honor roll. Da.C. still has some outbursts at school, bullying other students and using racial slurs, issues on the bus, and fights with his brother. He attends weekly counseling at school and additional sessions are added following any behavior outbursts. H.C. also has issues on the bus and trouble sitting still. His grades are decent but he has trouble paying attention in class and completing his work. He attends weekly counseling. Sister, De.C., is a typical two-year old. The foster parents expressed their willingness to adopt all three children.

{¶ 17} The children attend weekly, one-hour online visitation with Mother; Father started visiting a few weeks after Mother but is uncomfortable and does not utilize the entire time. LCCS has terminated online visitations early where Mother or Father makes inappropriate comments about the children returning home or when they start arguing with the LCCS worker supervising the visits. Their in-person visitation is bi-monthly.

{¶ 18} Oregon Patrol Officer Dana Kriner testified that on November 3, 2024, at approximately 7:00 p.m., she was at the Walmart store in Oregon on another matter when

5.

a family flagged her down expressing concern about a child left alone in a vehicle. She walked up to the vehicle and through the rolled down back window she observed a young male juvenile. Kriner asked the boy the name of his parent or guardian and he stated "grandma, D****," but he could not provide a phone number. Though he had a cell phone and was using it to play a game, he could not contact anyone on it.

{¶ 19} After Grandmother and Mother returned (the store security video showed they were gone for 28 minutes), they became argumentative. Kriner charged Grandmother, the child's legal custodian, with child endangerment.

{¶ 20} On September 27, 2023, LCCS assigned the family's ongoing caseworker. She testified that on that date the family had a case plan in effect. In 2023, Mother completed a diagnostic assessment and attended one introductory class at the Child Abuse and Prevention Center, but did not engage in any plan services that year.

{¶ 21} In 2024, Mother received a second dual diagnostic assessment through Harbor and received mental health services. After LCCS moved for permanent custody in November 2024, she began consistently attending therapy at Unison.

{¶ 22} Pursuant to the 2023 case plan, LCCS referred Mother to domestic violence survivors' counseling. She began the 16-week program in January 2024, but did not complete it until September 2024. After LCCS moved for permanent custody, she retook the class. Mother began parenting classes in September 2024. Mother did not explain her delay in engaging in services. Mother regularly attends visitation with the children.

{¶ 23} LCCS did not add Father's case plan services until January 2025, because his whereabouts were unknown. The services included a dual diagnostic assessment,

6.

domestic violence batterer's counseling, parenting classes, and housing. Since then, Father regularly attends online visits but not for the full hour.

{¶ 24} The caseworker testified that while the children were in Mother's care, LCCS had concerns of Father being in the home. Mother eventually admitted that Father had resided in the home the entire time.

{¶ 25} The children were placed with Grandmother from April to November 2024, when Grandmother left H.C. in her vehicle unattended. The children were placed in foster care.

{¶ 26} The caseworker testified regarding the case plan services identified for the children. Da.C. and H.C. were to complete a dual diagnostic assessment and attend counseling for children who have witnessed domestic violence in the home. The children completed the assessments but none of the recommendations were followed. De.C.'s case plan included a developmental assessment with Help Me Grow which Grandmother completed following several failed scheduling attempts by the provider and agency.

{¶ 27} While living with Mother, Da.C. had disruptive and aggressive behaviors at school resulting in a suspension. He was also suspended while in Grandmother's care. During this time, H.C. also had behavior issues at school, though less extreme. In 2024, Da.C. had 56 school absences and H.C. had 40; the caseworker acknowledged that the absences were during the period of maternal grandfather's passing. At Mother's home, the boys "were out of control" and would not listen to her. The caseworker observed them outside playing with a rusty saw, they would hit and slap each other, they peed on

7.

each other, they were destructive, and they cursed and used racial slurs.  De.C. would also act out.

{¶ 28} While in foster care, the boys' behavior improved dramatically.  Da.C. has all A's in school and is on the honor roll and H.C. is also doing well; they are rarely absent.  They also attend therapy at school.

{¶ 29} The caseworker testified that awarding LCCS permanent custody of the children was in their best interests because Mother did not engage in case plan services and lacked honesty.  She stated that the children are doing very well at their current placement and it would be better for their safety to remain there.

{¶ 30} During cross, the caseworker acknowledged that the November 2024 Walmart incident, in part, derailed LCCS' plan to reunite Mother with the children.  The caseworker explained that Mother's presence during the incident combined with the fact that she failed to admit her presence concerned LCCS as did her relationship with Father.  The caseworker agreed that Mother eventually completed her domestic violence classes and is currently engaged in individual therapy.   LCCS rested its case.

{¶ 31} Father testified that in January 2024, he agreed to leave the family home for three months and went to live with his father.  After a few weeks he began "couch surfing."  He admitted to receiving the initial case plan, but he did not participate in case plan services and thought that Mother was "handling the issue."  He reached out to LCCS following the Walmart incident, and engaged in services.

{¶ 32} Father had not completed the domestic violence batterer's program because he could not get in until after the hearing date.  He stated that the online visits were not

8.

going well because the children are either extremely late or do not come to the visit at all. He said that the in-person visits went much better.

{¶ 33} Father stated that he was living with a friend and waiting on housing. He is working and able to provide for the children's food, clothing, and other necessities. He admitted that he just started seeing the children a few months ago and before that it had been two years.

{¶ 34} Father denied living in the family home when he was not supposed to despite Mother and children indicating otherwise. Father stated that he had almost daily phone contact with the children when they were still with Mother and spoke with them about once a month when they were in Grandmother's care.

{¶ 35} Mother's first witness, Erica Long, a parent education coordinator at the Child Abuse and Prevention Center, testified that on November 12, 2024, Mother transferred into her classes midway through her parenting program. Long stated that Mother attended all the weekly phone classes, sometimes requesting multiple sessions per week. As of the hearing date, Mother completed 9 additional sessions focusing on the November Walmart incident. Long stated that Mother completed a total of 30 sessions: 4 parenting, 17 Survivor to Thriver, and 9 case management, with 5 of them in-person.

{¶ 36} Mother acknowledged that the cause of LCCS' April 2024 removal of the children from her care was her failure to engage in services and the concern that Father was in the home. Mother denied that Father was in the home between January 2023 and April 2024. She stated that he called the children through Facebook and that her sister monitored the video calls.

9.

{¶ 37} Regarding the Walmart incident, Mother stated that she deferred to Grandmother's judgment when leaving H.C. in the car. They intended to make a quick trip in and out, they locked the door and H.C. had a cell phone and knew how to call and text. Mother said that through parenting classes she has learned to rely on her own judgment.

{¶ 38} During cross, Mother again testified that Father was not in the home from January 2023 through April 2024. She explained that she told the caseworker that Father came to the home's backyard to return her dog. Mother stated that the caseworker mistakenly testified that she admitted to Father being in the house. Mother explained that she delayed engaging in her case plan services due to job issues and depression caused by her father's passing.

{¶ 39} Family friend Debbie S. testified that she filed a third-party complaint for legal custody to keep the children together as a family. She agreed that she has not seen the children in at least six months. LCCS began a home study but she did not know the outcome. She acknowledged an outstanding warrant in Oregon Municipal Court for failure to appear. Debbie stated she got her appointments confused and that the underlying charge would be dismissed.

{¶ 40} Debbie testified that she lives in a two-bedroom apartment with Mother's sister and her two children. She stated that she was in the process of getting her own apartment but had not yet secured one.

{¶ 41} Grandmother presented the testimony of Zachary M., the father of Mother's sister's child. He stated that Grandmother frequently watches his four-year-old

son. He has no concerns for his son's safety when he is with Grandmother. She properly supervises him and uses proper car restraints when they go out in the community. He stated that Grandmother's house is equipped with beds for Da.C. and H.C. and that De.C. has her own room.

{¶ 42} Grandmother testified that she had custody of the children until November 2024 when she made a mistake she deeply regretted. She explained thar she thought the trip into Walmart would take ten minutes, it was 60 degrees outside, and H.C. had a cell phone and he knew how to make calls or text.

{¶ 43} Grandmother loves being with the children. She signed them up for sports, took them to the Toledo Zoo and Imagination Station with her memberships, took them to water parks, Cedar Point, Disney World and Universal Studios, and took them on a cruise to the Bahamas.

{¶ 44} Grandmother is currently engaged in parenting classes. Apart from the child endangering, Grandmother has no other criminal record or issues with drugs, alcohol, or physical abuse. She lives on social security and can financially care for the children. The children had their own beds and space in the home and plenty of food. There are no weapons in the home.

{¶ 45} Grandmother stated that other than the November Walmart incident, she previously followed all the court's orders and would continue to do so if she received custody. She stated that when she had custody of the children the older two were in school and only missed days with a medical excuse. The boys did not have any significant behavior issues while in her home.

11.

{¶ 46} Pamela D. has been friends with Grandmother for over ten years. She had been present during several outings involving Grandmother and the children and never had any concerns. She has 24 grandchildren and would allow them to be around Grandmother.

{¶ 47} Pamela stated that she was shocked when she learned that Grandmother left H.C. alone in the car because it was out of character. She surmised that Grandmother must have been in a hurry.

{¶ 48} The children's GAL testified that after conducting her own independent investigation and reviewing the history of the case and the testimony presented, she "very sadly" recommended that LCCS be awarded permanent custody of the children. The GAL explained that the case began as a domestic violence incident where the parents were required to separate and complete their services. That did not happen. Instead, Mother delayed her services for nearly a year and did not get the children their recommended services. Father did essentially nothing until LCCS moved for permanent custody. Additionally, the parties vacillated between saying they were in a relationship, not in a relationship, that Father lived in the home or did not live in the home. The children were also having contact with Father that the GAL believed was in person.

{¶ 49} The GAL and the family's caseworker would "compare notes" on what the parties told them often hearing different things from different people and sometime multiple stories from the same individual. The GAL heard from two different sources, including Mother, that Mother and Father were never apart. Father testified that he learned about the Walmart incident because he was working on a friend's car at the time

12.

but he previously told the caseworker that he was working on Grandmother's car; Grandmother denied it.

{¶ 50} The GAL explained that the parents failed to timely engage in services and after nearly two years of LCCS involvement, they are now "panicking trying to do services at the last minute." This "ongoing behavior" formed the basis of the GAL's recommendation.

{¶ 51} During cross, the GAL acknowledged after the children's removal in April 2024, Mother gave no indication that she and Father were still in contact. She also agreed that Mother completed her case plan services.

{¶ 52} The GAL agreed that Grandmother fully acknowledged her mistake, enrolled in parenting classes, and in March 2026, is eligible to have the endangering change expunged. The GAL noted that until then, Grandmother's home study could not be approved. She agreed that it is possible to recommend placement with an unapproved home study. The GAL's report reflected her testimony and was admitted into evidence.

### The Juvenile Court's Judgment

{¶ 53} On May 21, 2025, the juvenile court announced its decision awarding LCCS permanent custody. The court found that under R.C. 2151.414(E)(1), the parents failed to remedy the problems which caused the children to be placed outside the home and that as to Father, R.C. 2151.414(E)(4) applied. The court found the parents' testimony to not be credible and concluded that reunification would not be in the children's best interests.

13.

**{¶ 54}** The court's June 26, 2025 judgment entry detailed its reasons for awarding LCCS permanent custody. The court initially found the parents testimony that Father was not in the home, despite previous admissions, to not be credible.

**{¶ 55}** The court found that R.C. 2151.414(E)(1) applied to Mother based on the fact that she "deceived" LCCS for the first year of the case by failing to disclose that Father remined in the home. After admitting the violation, she then attempted to recant the admission during the permanent custody hearing. The court noted that although Mother participated in domestic violence counseling, parenting classes, and individual counseling, she "has not demonstrated any significant change in her ability to protect the children." Father refused to cooperate with LCCS for nearly two years.

**{¶ 56}** The court included a finding that under R.C. 2151.414(E)(4), Mother demonstrated a lack of commitment to her children by continuing to expose them to Father, then lying to LCCS and by leaving H.C. unattended in a vehicle in a Walmart parking lot. As for Father, he did not request to visit his children for two years.

**{¶ 57}** The court then concluded that granting LCCS permanent custody was in the children's best interests based on the children's relationships with their parents, foster parents, and other caregivers. The court noted that foster parents are addressing the older boys' behavior issues through counseling and structure in the home. No appropriate relative placement was identified and the children cannot be expected to wait for their parents to address the reasons for removal.

**{¶ 58}** Mother's motion for reunification, Father's, Grandmother's, and Debbie S.'s motions for legal custody were all denied. This appeal followed.

14.

## II. Assignments of Error

**{¶ 59}** Appellants raise two assignments of error for review:

I. The trial court's finding pursuant to R.C. 2151.414(E)(1) that mother failed continuously and repeatedly to substantially remedy the conditions causing the children to be placed outside the children's home was not supported by clear and convincing evidence.

II. The trial court's finding that maternal grandmother was not suitable for legal custody was not supported by a preponderance of the evidence.

## III. Analysis

### Termination of Mother's Parental Rights

**{¶ 60}** In the first assignment of error, Mother claims error in the juvenile court's determination that under R.C. 2151.414(E)(1),[1] she failed to remedy the conditions causing her to lose custody.

**{¶ 61}** In order to terminate parental rights and award permanent custody of a child to a public services agency under R.C. 2151.414, the juvenile court must find two things by clear and convincing evidence: (1) that one of the enumerated factors in R.C. 2151.414(B)(1)(a)-(e) apply, and (2) that permanent custody is in the best interests of the child.  R.C. 2151.414(B)(1).  Clear and convincing evidence is that which is sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established.  *In re T.J.*, 2021-Ohio-4085, ¶ 36 (6th Dist.), citing *Cross v. Ledford*, 161

---

[1]We note that at the May 21, 2025 hearing the court stated that (E)(1) applied to Mother as the basis for terminating her parental rights. The June 26, 2025 judgment also reflects a finding under R.C. 2151.414(E)(4).  Regardless, a trial court need only find one factor to uphold a termination decision. *In re I.H.,* 2020-Ohio-4853, ¶ 35 (6th Dist.), citing *In re C.F.*, 2007-Ohio-1104, ¶ 50.

15.

Ohio St. 469 (1954), paragraph three of the syllabus. The clear and convincing standard requires more than a preponderance of the evidence, but it does not require proof beyond a reasonable doubt. *Cross* at paragraph three of the syllabus.

{¶ 62} On appeal, a decision terminating parental rights in a permanent custody case will not be reversed unless it is against the manifest weight of the evidence. *In re L.H.*, 2022-Ohio-3263, ¶ 20 (6th Dist.), citing *In re A.H.*, 2011-Ohio-4857, ¶ 11 (6th Dist.). "Reversal is proper only where its determined, after weighing the evidence and all reasonable inferences including the credibility of the witnesses, that the juvenile court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed." *In re S.S.*, 2023-Ohio-1663, ¶ 27 (6th Dist.), citing *In re T.J.* at ¶ 40, citing *State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997).

{¶ 63} "As the trier of fact, the juvenile court is in the best position to weigh the evidence and evaluate the testimony." *In re W.M.*, 2022-Ohio-1978, ¶ 42 (6th Dist.). "Thus, 'in determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts.'" (Citations omitted.) *Id.* In weighing the evidence, the court defers to the "'[juvenile] court's determinations on matters of credibility, which are crucial in these cases, where demeanor and attitude are not reflected well by the written record.' (Citations omitted*.)" In re Maj.A.,* 2018-Ohio-575, ¶ 40 (6th Dist.), quoting *In re E.W.*, 2017-Ohio-7258, ¶ 34 (4th Dist.).

{¶ 64} Here, the juvenile court found that R.C. 2151.414(E)(1) applies to Mother, the section provides:

16.

Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

{¶ 65} Mother contends that although she delayed engaging in services, in 2024, she completed all the case plan services and regularly visited her children. Mother claimed that "[t]estimony indicated that there had been no contact for 'over a year', presumptively starting in January 2023, and extending until early 2024" and that it was alleged that the parties re-established contact in April 2024.

{¶ 66} Mother addressed the Walmart incident stating that Mother's parenting educator felt that she learned from the experience that she needed to separate from Grandmother and handle parenting differently than she did.

{¶ 67} The court's judgment entry stated that its April 2024 award of temporary custody to LCCS was due to Father being in the home in violation of the no contact order. Mother had disclosed to the GAL and caseworker that Father was in the home and the children reported that Father hid when the caseworker visited. At the permanent custody hearing, both Mother and Father testified that he was not in the home. As to the Walmart incident, the court noted that LCCS learned that Mother was present only after obtaining the police report. The court stressed that these incidents occurred while Mother

17.

attended domestic violence and parenting classes and evidenced her inability to make any significant changes in her behavior and provide a safe environment for her children.

{¶ 68} After carefully reviewing the record and all the evidence and affording every reasonable intendment and every reasonable presumption in favor of the judgment and the finding of facts, this court must conclude that this is not the exceptional case where the juvenile court clearly lost its way and created a manifest miscarriage of justice. The court, having been present for Mother's and Father's testimony, was in the best position to make credibility determinations and to judge their sincerity. The first assignment of error is not well-taken.

### Denial of Grandmother's Legal Custody Motion

{¶ 69} The second assignment of error claims that the court erred when it denied Grandmother's legal custody motion. A legal custody determination is reviewed for an abuse of discretion. *In re G.B.*, 2024-Ohio-5528, ¶ 58 (6th Dist.), citing *In re H.H.*, 2024-Ohio-686, ¶ 64 (6th Dist.). An abuse of discretion implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 70} Under R.C. 2151.353(A)(3), a juvenile court may award legal custody of any child to any person who files a motion seeking legal custody. "In order to grant legal custody of a dependent child to a nonparent, the trial court must find, by a preponderance of the evidence that legal custody is in the child's best interest." *In re Am.H.*, 2019-Ohio-4374, ¶ 36 (6th Dist.), citing *In re Christopher M.*, 2007-Ohio-1040, ¶ 12 (6th Dist.); *In re A.B.*, 2020-Ohio-3990, ¶ 15 (6th Dist.). "In making such a determination 'courts have

18.

looked to the best interest factors of R.C. 2151.414(D), R.C. 3109.04(F)(1), a combination of the two, or general notions of what should be considered regarding the best interests of the [child].'" *In re A.D.*, 2017-Ohio-6913, ¶ 32 (6th Dist.), quoting *In re A.K.*, 2012-Ohio-4430, ¶ 25 (9th Dist.); *see In re J.D.*, 2024-Ohio-1443, ¶ 18 (6th Dist.).

{¶ 71} Here, Grandmother contends that LCCS did not demonstrate, by clear and convincing evidence, that awarding her legal custody was not in the children's best interests. Grandmother points to the absence of any testimony of her financial instability, lack of suitable housing, any substance abuse concerns, or prior domestic violence history. She was actively involved in the children's lives and in addition to basic needs, provided them with many community experiences. Grandmother acknowledges the seriousness of the Walmart incident but notes that while police charged her with child endangering, she entered a no contest plea to attempted child endangering.

{¶ 72} LCCS counters that when the children were placed in her care, she signed an agreement that they would be properly supervised. Further, she failed to timely enroll the children in therapy.

{¶ 73} Upon review, the juvenile court's decision was not unreasonable, arbitrary, or unconscionable. There was evidence presented that following Grandmother's child endangering charge and subsequent conviction, LCCS could not approve her home study until her record had been expunged. Further, evidence was presented that Grandmother lacked honesty regarding Father's contact with Mother and the children. Accordingly, the court did not err in holding that it was in the children's best interests to deny

19.

Grandmother's motion for legal custody. The second assignment of error is not well-taken.

## IV. Conclusion

**{¶ 74}** For the foregoing reasons, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Appellants are ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.
_____
                                                    JUDGE

Myron C. Duhart, J.
_____
                                                    JUDGE

Charles E. Sulek, P.J.
CONCUR.                                             JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.