[Cite as *In re K.S.*, 2022-Ohio-2810.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
HURON COUNTY

In re K.S.

Court of Appeals No.  H-21-020

Trial Court No.  DNA-20-054

**<u>DECISION AND JUDGMENT</u>**

Decided:  August 12, 2022

* * * * *

James Joel Sitterly, Huron County Prosecuting Attorney, and
Richard H. Palau, Assistant Prosecuting Attorney, for appellee,
Huron County Department of Job & Family Services.

Autumn D. Adams, for appellant, D.S.

Paul D. Dolce, for appellee, B.M.

* * * * *

**MAYLE, J.**

## I. Introduction

{¶ 1} In this expedited case, D.S., the mother and appellant herein, appeals a

November 15, 2021 judgment by the Huron County Court of Common Pleas, Juvenile

Division that awarded legal custody of the minor child, K.S., to her biological father, B.M.  As set forth below, we affirm the trial court's decision.

## II. Background

{¶ 2} Mother has two children:  K.S. (D.O.B 12/11/2019) and K.S.'s older half-brother, A.B. (D.O.B. 8/4/2006).  This case involves K.S. only.

{¶ 3} On May 6, 2020, Mother's father ("Grandfather") was called to Mother's apartment by A.B., then 13-years old, who was having an allergic reaction and could not find his medication.  After arriving and assisting A.B., Grandfather found Mother and K.S., then five-months old, in Mother's bedroom.  Mother was "groggy and argu[mentative]."  Grandfather tried to take both children from the apartment, but Mother forbade him from "taking [K.S.] anywhere" and said that A.B. would be "grounded if he left."  Grandfather and A.B. left.

{¶ 4} Over the next 45 minutes, Grandfather called Mother repeatedly to check on her.  When she did not answer her phone, Grandfather returned to the apartment to find "the baby * * * crying and * * * laying in [A.B.'s] bedroom on a pile of potato chips[,] * * * naked."  Mother was "incoherent," lying on her bedroom floor in a "fetal position" with her "head on a box."  Grandfather assumed that Mother was "[u]nder the influence of something * * * because that's been a problem" in the past.  Rather than "argue with her," Grandfather "gathered up" K.S. and left.  He also called the police to request a welfare check on Mother.

2.

{¶ 5} The police found Mother "sitting Indian style over a cardboard box with some drool coming out of her mouth." Mother's pupils were constricted; her eye movements were "very slow [and] lethargic;" and her "speech was very slurred." Before Mother was transported to a hospital, she provided the police with "approximately 25 pill bottles with different prescriptions * * * with different doctors' names on them."

{¶ 6} The Huron County Department of Job and Family Services ("JFS") filed a complaint that same day, and K.S. and A.B. were placed in the care of their grandparents, with protective supervision granted to JFS. The children were later determined to be dependent and neglected, following a June 11, 2020 adjudicatory hearing.

{¶ 7} B.M. ("Father") was identified as the likely father of K.S. Once his paternity was confirmed, Father obtained counsel and expressed an interest in establishing a relationship with his daughter. Father was granted limited, supervised visitation with K.S., at the agency.

{¶ 8} A case plan was developed for both parents. Mother's case plan required her to complete mental health and drug and alcohol assessments, to obtain employment, complete parenting classes, and submit to random drug screens. Father's case plan also required him to complete parenting classes and to submit to random drug screens.

{¶ 9} Dispositional review hearings were held every few months, in part, to track the parents' progress with their case plans. There is no dispute that Mother struggled to maintain her sobriety. For example, at the November 12, 2020 hearing, Mother admitted

3.

that she "did try to commit suicide and * * * had a relapse," and the court heard other testimony that Mother had failed to contact her case worker, was a no show for drug tests, and missed two counseling appointments. Five months later, at the April 29, 2021 hearing, Mother was still "not cooperating, not taking tests." Mother failed to attend the July 8, 2021 review hearing, and her attorney reported that he had "no contact with [M]other for some time." JFS also reported at that time that Mother had tested positive for "Meth," multiple times, back in May and June and that she had not seen her counselor since early April.

{¶ 10} By contrast, Father was doing "well" with his case plan by testing cleanly to multiple drug screens and by completing his parenting classes. After passing a home inspection, Father was granted several hours of unsupervised visitation, which gradually developed into overnight visits. By September of 2021, Father was exercising "five or so overnights per week" with K.S. and had a "very cordial relationship" with her grandparents, who continued to serve as the temporary guardians of K.S. and who watched her while Father was at work.

{¶ 11} Father filed for legal custody of K.S. on July 7, 2021. Thereafter, Mother filed her own motion for legal custody, and the motions were heard together at a hearing on November 9, 2021.

{¶ 12} Father testified that he has developed a "pretty good bond" with K.S. and that his two older children, who mostly live with him, interact "wonderful[ly]" with her.

4.

Father has worked for the same construction company for the last 14 years, and his position as foreman requires him to work five to six days per week, between ten to twelve hours per day. If granted legal custody of K.S., Father told the court that he would continue to rely on the grandparents for child care, which would also allow Mother, who lives nearby, to continue to have daily contact with K.S.

{¶ 13} Mother testified that she developed an addiction to opioids, following a back injury ten years ago. Mother claimed that she voluntarily began treatment for anxiety and substance abuse, even before K.S. was born and said that she would likely require counseling services "for the rest of [her] life." Mother testified that she wanted custody of K.S. "just to prove to the court how serious I am about my sobriety."

{¶ 14} The case manager testified that Father had been "fully compliant" with his case plan and observed that K.S. is "doing really well" and is "happy" at Father's. Although Mother did not comply with her case plan—by testing positive for drugs, refusing random drug screens and failing to meet with her case manager—she did complete her parenting classes and remained engaged with her mental health treatment, even during her relapses. The case manager testified that JFS was "in agreement" with Father's motion for legal custody of K.S., with "standard visitation" granted to mother, i.e. every other weekend, beginning on Thursday at 6 p.m. until Sunday at 6 p.m. The GAL also supported Father's motion, with the standard visitation order for Mother, plus "anything additional" that the parties could agree upon.

5.

**{¶ 15}** On November 15, 2021, the court found by a preponderance of the evidence that it would be in K.S.'s best interest to be placed in the legal custody of Father. It granted Mother parenting time with K.S., according to the standard local juvenile court schedule.

**{¶ 16}** Mother appealed and raises a single assignment of error for our review:

> ISSUE PRESENTED FOR REVIEW: Did the Trial Court abuse its discretion when it failed to reunify K.S. with Mother despite Mother's significant progress, if not completion of, case plan services, and instead ordered K.S. to a parent she only had a relationship with for mere months?

### III. Law and Analysis

**{¶ 17}** Legal custody proceedings vest in the custodian the right to have physical care and control of the child, subject to any residual parental rights and responsibilities that remain intact with the birth parents. *In re C.R.,* 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 1188, ¶ 14-15. Although a disposition of legal custody is less drastic than permanent custody because it does not completely sever parental rights, it "potentially terminates a parent's constitutional right to custody of her child because that placement "'is intended to be permanent in nature.'" *In re A.A.,* 9th Dist. No. 25253, 2010-Ohio-5735, ¶ 7, quoting R.C. 2151.42.

**{¶ 18}** A trial court determines an award of legal custody based upon proof by a preponderance of the evidence. *In re Nice*, 141 Ohio App.3d 445, 455, 751 N.E.2d 552

6.

(7th Dist.2001). Because custody determinations "are some of the most difficult and agonizing decisions a trial judge must make," a trial judge must have broad discretion in considering all of the evidence. *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997). Therefore, an award of legal custody will not be reversed on appeal absent an abuse of discretion. *Id.; see also In re E.H.,* 6th Dist. Ottawa No. OT-15-044, 2016-Ohio-8170. To constitute an abuse of discretion, the ruling must be unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 19} An award of legal custody is authorized by statute where a child has been adjudicated neglected, dependent, or abused. R.C. 2151.353(A)(3). "At any hearing in which a court is asked to modify or terminate an order of disposition issued under section 2151.353, 2151.415, or 2151.417 of the Revised Code, the court, in determining whether to return the child to the child's parents, shall consider whether it is in the best interest of the child." R.C. 2151.42(A). "[C]ourts have looked to the best interest factors of R.C. 2151.414(D) [Regarding Permanent Custody], R.C. 3109.04(F)(1) [Regarding Shared Parenting], a combination of the two, or general notions of what should be considered regarding the best interests of the [child]." *In re E.H.* at ¶ 16, quoting *In re A.K.,* 9th Dist. Summit No. 26291, 2012-Ohio-4430, ¶ 25.

{¶ 20} The best interest factors set forth in R.C. 2151.414(D)(1) provide that the court "shall consider all relevant factors, including but not limited to:"

7.

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child * * *;

(d) The child's need for a legally secure permanent placement * * *;

(e) Whether any of the factors in division (E)(7) to (11) of this section apply in relation to the parents and child.

Likewise, the best interest factors set forth in R.C. 3109.04(F)(1) also provide that the court "shall consider" the following:

(a) The wishes of the child's parents regarding the child's care;

(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make child support payments, including all arrearages * * *;

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused or a neglected child * * *;

* * *

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

{¶ 21} The record establishes that the trial court, in determining the best interest of K.S., clearly considered the applicable factors set forth above. It cited the following as relevant in its best interest determination: Mother's drug "relapse" in the "spring of 2021" and again in "September 2021;" Mother's mental health diagnosis (anxiety); and the likely need that Mother will require treatment "for the rest of her life." Conversely,

the court found that Father had been "fully compliant" with his case plan and had "always timely submitted to substance abuse screens that have been clean." Moreover, it specifically found that Father "resides in a home that is safe and appropriate" for K.S. The court concluded that it would be in K.S.'s best interest "to be placed in the legal custody of her father [because] [t]his arrangement would offer the most stability for the [K.S.]." The court further remarked that, "with the adoption of a standard parenting time order for [Mother], K.S. would also benefit from "frequent and continuing contact with" her half-brother, A.B. (Nov. 15, 2021 J.E. at 1-2).

{¶ 22} Upon review, we find ample evidence to support the trial court's best interest findings. Mother's drug problems are serious and long-standing. Indeed, according to the record, a prior investigation was opened by JFS "regarding [K.S.] testing positive at birth" but was closed as "unsubstantiated" because Mother refused to submit to a drug screen or otherwise cooperate with the agency. During the pendency of the instant case, Mother relapsed multiple times. According to Grandfather, Mother appeared to be under-the-influence of drugs "about once a month." And, while Mother was more successful in maintaining her mental health services, the record contains multiple references to her experiencing suicidal thoughts.

{¶ 23} The record also supports the trial court's findings with regard to Father's ability to care for and support K.S. We begin by noting that Mother admitted at trial that she purposely did not tell Father that she was pregnant. But, once Father did learn about

K.S., he was "one hundred percent compliant with anything that [was] asked of him [by the agency]." And, Father's parenting time with K.S. grew from very limited, supervised visits at the agency, to multiple overnight visits per week, in his own home. The GAL observed some of those visits and testified that she could "definitely tell a difference in the relationship from very early on when [Father] was a stranger to [K.S.]. * * * She [now] seems very happy when she is with him." Even Mother acknowledged that K.S. has become "more comfortable" with Father. Importantly, Father and the grandparents also expressed their ability to work together to provide care for K.S. when Father is at work.

{¶ 24} Mother makes several arguments in support of her claim that the trial court abused its discretion in awarding custody to Father. First, Mother claims that K.S. should have been reunified with her because K.S.'s "custodial history has always been with Mother." As argued by Father and the agency, K.S. was removed from Mother's care before she was five-months old, and she remained in temporary custody for the next 18 months, until the trial. Thus, K.S.'s "custodial history" was mostly spent in the grandparent's care, not Mothers, and Father's visitation with K.S. grew significantly over that same time period. Thus, we also reject Mother's claim that K.S. has "only spent a minuscule fraction of her life with Father" and that placing K.S. with Father would be "more disruptive," than placing her with Mother.

11.

**{¶ 25}** Second, Mother claims that she "compli[ed] with * * * if not completed case plan services" by becoming sober, maintaining her housing "even without working," and receiving mental health services. While evidence of case plan compliance is relevant to a best interest determination, it is not dispositive of it. *In re T.J.,* 6th Dist. Erie Nos. E-21-007,008, 2021-Ohio-4085, ¶ 72 citing *Matter of M.W.,* 10th Dist. Franklin No. 19AP-769, 2020-Ohio-5199, ¶ 57. In any event, the case manager and the GAL each testified that Mother did *not* comply with her case plan, for some of the very same reasons cited by Mother. That is, she was entirely dependent on others to meet her financial needs, and despite promising to apply for Social Security Disability benefits, she failed to do so. We share the GAL's opinion that Mother's "dependen[cy] on others to assist her to meet her needs * * * is concerning."

**{¶ 26}** Moreover, while Mother's sobriety leading up to the trial is to be commended, it is also true that Mother has shown a "pattern of abuse" consisting of a "cycle between doing well and then having relapses." The grandparents' testimony highlighted that point. Grandfather testified that while Mother had "been in good shape for the last couple weeks," she knows to "stay away" if she is "messed up * * * so it's not hard on the kids." Likewise, Grandmother said that she "made sure" that Mother was only allowed to visit with the kids when she was "sober." Thus, despite the fact that Mother made some progress toward complying with her case plan, we cannot say that the trial court abused its discretion in weighing this factor when rendering its decision.

12.

**{¶ 27}** Finally, we address the references made in Mother's brief to her past claim of inappropriate behavior between Father's children, back in 2016. Mother cites the incident as a reason that Father's motion for legal custody should be denied. According to the record, JFS did receive reports of inappropriate conduct but none was substantiated. Moreover, the case manager specifically testified—in this case—that she had "no concerns" about the safety of Father's home or the interactions between K.S. and Father's two other children.

## IV. Conclusion

**{¶ 28}** After reviewing the record, we find that the trial court did not abuse its discretion in granting legal custody of K.S. to Father. The court considered the relevant best interest factors before awarding custody to Father, and its decision in weighing those factors in favor of Father is supported by a preponderance of the evidence. That determination is not arbitrary, unconscionable, or unreasonable. Accordingly, Mother's assignment of error is found not well-taken.

**{¶ 29}** The judgment of the Huron County Court of Common Pleas, Juvenile Division, is affirmed. Mother is ordered to pay the court costs of this appeal pursuant to App. R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.                    _____
                                                JUDGE

Christine E. Mayle, J.

Myron C. Duhart, P.J.                      _____
CONCUR.                                            JUDGE


_____
                                                JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.