[Cite as *In re S.L.*, 2025-Ohio-4608.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

In re S.L., W.L., Sk.L., A.L.

Court of Appeals No. WD-24-087

Trial Court No. 2023JC0943
2023JC0944
2023JC0946
2023JC0947

**DECISION AND JUDGMENT**

Decided: October 3, 2025

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
Wesley R. True, Assistant Prosecuting Attorney, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**SULEK, P.J.**

{¶ 1} Appellant E.L. ("mother") appeals the judgment of the Wood County Court

of Common Pleas, Juvenile Division, awarding legal custody of the minor children S.L.,

W.L., Sk.L., and A.L. to maternal grandparents W.S. and B.S.[1] For the reasons that follow, the trial court's judgment is affirmed.

## I. Factual Background and Procedural History

{¶ 2} Appellee the Wood County Department of Job and Family Services ("the agency") became involved with the family in November 2023 when it received a report that mother, her boyfriend J.J., and four children were living in a van behind a gas station. The children, at the time aged 13, 11, 8, and 6, were observed to be unsupervised, dirty, and malnourished.

{¶ 3} A shelter care hearing was held, and the children were placed in the temporary custody of the agency. On January 4, 2024, mother stipulated to a finding of dependency.

{¶ 4} The juvenile court held a dispositional hearing on February 6, 2024, at which it placed the children in the temporary custody of the maternal grandparents with the agency providing protective supervision. The trial court also approved case plan services for mother, including mental health services, substance abuse services, and parenting classes.

---

[1] Also before the juvenile court was two motions by father, W.L., for legal custody and for court-ordered visitation. The trial court denied father's motion for legal custody but granted, in part, his motion for visitation. Father, however, has not appealed the juvenile court's judgment. This appeal, therefore, will focus solely on the facts and issues as they pertain to mother.

2.

**{¶ 5}** On May 10, 2024, the agency filed a motion to award legal custody of the children to the maternal grandparents. A hearing on the legal custody matter was held on September 24, 2024, and October 29, 2024.

**{¶ 6}** At the hearing, the agency first presented the testimony of William Metzler, the original caseworker for the family. Metzler testified that the agency received a report of the family staying at a gas station in Perrysburg, Ohio. The agency placed the family in a hotel for the night, and shortly thereafter placed the children in the temporary custody of the maternal grandparents. The maternal grandparents live in Vermillion, Ohio, over one hour away from Wood County.

**{¶ 7}** Metzler explained that mother was originally living with the children at the maternal grandparents' house for several years. She then met J.J. online in the spring of 2023. In August 2023, there was an issue between mother and maternal grandmother, with each claiming that the other "put her hands on [me]." Maternal grandmother then allegedly said to mother, "if you leave, don't come back." Mother left with the children, and they began living in the van and various hotel and motel rooms. At no point did mother contact maternal grandparents to see if the children could stay with them.

**{¶ 8}** The agency's concerns for mother included a lack of permanent and stable housing, her developmental delays, and the condition of the children at the time they were found. Its concerns for J.J. were similar and also included substance abuse. To address those concerns, the agency recommended mental health services, substance abuse services, and parenting classes.

3.

{¶ 9} Metzler testified that when he first became involved after the children were removed, mother and J.J. had found a family shelter in Toledo, Ohio. A few weeks later, though, they were kicked out for committing multiple rule violations. After leaving the shelter, mother and J.J. slept in the van until it was repossessed and they found an abandoned house. They stayed in the abandoned house for several months until they found shelter at the Beach House near the end of May. They remained at the Beach House homeless shelter through the remainder of Metzler's time on the case. Metzler was presented with evidence on cross-examination that mother was now approved for a residence with Neighborhood Properties, Inc., whose purpose is "[h]elping families transition from homelessness to permanent housing."

{¶ 10} As to mother's mental health, Metzler testified that mother did an initial mental health assessment, but she indicated to the assessor that she had no mental health history. Metzler learned this was not true, and that in 2018 the Cleveland Clinic diagnosed mother with anxiety and depression. Because of mother's inaccurate report, no mental health services were recommended or provided. Metzler was unaware that mother treated with a therapist while she resided at the Beach House.

{¶ 11} Regarding the substance abuse issues, mother was recommended to do group therapy on a regular basis up to four times a week to address her THC usage. Metzler testified that mother's attendance was "spotty, at best." On cross-examination, however, Metzler acknowledged that mother successfully completed the substance abuse services through Unison after he left the case.

4.

{¶ 12} Metzler also testified that parenting services were recommended for mother, but she did not make any progress on those services while he was assigned to her case.

{¶ 13} Regarding J.J., Metzler testified that he had a history of mental health issues and alcohol dependence. J.J. was offered mental health services, substance abuse services, and parenting classes. He resisted participating in these services throughout the life of the case, only beginning to engage after the agency's motion for legal custody was filed. In addition, Metzler noted that J.J. did not work, and his only income came through plasma donations.

{¶ 14} On the subject of visitation, mother initially was visiting the children in person, but when her van was repossessed the agency set up weekly phone calls until it could arrange transportation. The phone calls lasted for approximately three months before the agency eventually paid $400 per week for a cab service to allow mother to visit in person. Only the two younger children visited with mother. The two older children refused to speak or visit with mother at any point during the case. Maternal grandfather supervised the visits and although the relationship between the adults was "a little contentious," grandfather was still willing to make sure that mother had a chance to spend time with her children. Metzler testified that the agency offered to help mother relocate closer to the children, whether that was finding another shelter or helping her with an apartment, but mother refused, stating that she wanted to stay in Toledo, Ohio, with J.J.

{¶ 15} Metzler offered that the biggest impediment to reunification was mother's minimization of the safety concerns for the children caused by being homeless. He also expressed concerns about mother's cognitive abilities, noting that Social Security determined she was cognitively disabled when she was 16 years old. Metzler testified that he would have long conversations with mother leaving him with concerns about her ability to understand what was being asked of her. He added that although mother worked a part-time job at Taco Bell, her income was not sufficient to meet her or her children's basic needs.

{¶ 16} Turning to the children, Metzler testified that since they have been in the maternal grandparents' care, they have gained weight, their teeth are healthier, they are now enrolled in school, they are engaged with the community, and there have been no issues with the home or the caretakers. In addition, the children are well-bonded to the maternal grandparents. In contrast, two of the children refused to speak with mother at any time, and only one of the four stated that she misses mother. Metzler believed that legal custody to the maternal grandparents was in the best interest of the children.

{¶ 17} J.J. testified next. He testified that he is currently working through the case plan services, having begun the parenting classes approximately one month earlier. He stated that because of all the requirements imposed on him by the agency he is unable to work, and his only income comes from donating plasma. J.J. also testified that he has been sober from drugs for years. He battles alcoholism, however, and last had a drink two months before the court hearing. J.J. disagreed with his therapist's report that he has mental health and emotional issues, stating that he takes his prescribed medication

6.

regularly and that he was doing fine before experiencing the stress of the agency's intervention. Finally, J.J. testified that he loves mother and the children very much, and he is committed to being with her and fighting for the children.

{¶ 18} The agency then called B.S., the maternal step-grandfather of the children as a witness. B.S. testified that four years ago Lorain County Child Protective Services placed the family with him and the maternal grandmother after it removed mother and the children from a house that B.S. rented to mother. The family was removed because mother was not sending the children to school and the home was infested with fleas. B.S. testified that his home is clean, neat, and suitable for the children.

{¶ 19} He also testified that the children are doing well in his custody. They have a daily routine, are enrolled in school, see medical doctors and therapists, and seem to be very happy. B.S. is seventy years old and his wife is in a wheelchair due to arthritis, but he testified that she is able to care for the children while he works operating his business. B.S. did acknowledge that he recently was in the hospital with kidney stones and an infection. He stated that he has been dealing with kidney stones his entire life, but this recent experience was his worst one.

{¶ 20} Finally, B.S. testified that he loves the children and is willing to offer a permanent placement for them. He also stated that he is willing to facilitate visitation with mother, and that he has not had any problems with visitation up to that point.

{¶ 21} Alicia Willey, the current caseworker who replaced Metzler, testified next. At the time of her testimony, she had been the assigned caseworker for approximately

7.

two and one-half months. Willey initially provided updates on mother's mental health, substance abuse, and parenting services.

{¶ 22} She explained that mother had been engaged in mental health therapy with Lydia Elick at the Beach House, but Elick withdrew as her counselor and suggested that mother seek alternative counseling because mother's six months at the Beach House was ending soon and it may be difficult for her to obtain transportation to continue to meet with Elick. In response, mother completed a mental health assessment with Unison on October 14, 2024.

{¶ 23} Regarding substance abuse services, Willey testified that mother completed those in August 2024. Mother recently provided a random drug screen, which came back positive for marijuana, but Willey noted that mother has a medical marijuana card. Willey did express some concern, however, with mother's budgeting decisions and her prioritization of her daily marijuana use when she is only working part-time and is living in a homeless shelter.

{¶ 24} As to parenting classes, Willey testified that those do not begin through Unison until after the mental health assessment, and they have not started yet. Willey noted that mother has not completed any parenting classes throughout the pendency of the case.

{¶ 25} In general, Willey testified that mother has made minimal, if any, progress on the case plan since she took over the case. Mother is working part-time at Taco Bell and is living at a homeless shelter for another month, after which she will be moved to a

8.

different homeless shelter in Toledo. Whenever Willey attempts to talk with mother about the case plan, mother stops responding or deflects from the issues.

{¶ 26} J.J. likewise has not made progress. He completed a substance abuse assessment, which recommended that he receive outpatient treatment, but he declined to participate. He also recently tested positive for amphetamines and methamphetamines. In addition, he is still living at the homeless shelter and does not have employment. Finally, he is engaged in mental health services and started parenting classes, although he has not attended the parenting classes in over a month.

{¶ 27} Willey believed that it would be in the best interest of the children to be placed in the legal custody of the maternal grandparents. She expounded that the children have stability and a routine, they are attending school and receiving services through school, and the two older children are struggling to even want to talk to mother or see her. She has no concerns with the care provided by the maternal grandparents, and she believes the maternal grandparents are willing to facilitate visits with mother. She further testified that she did not believe additional time would allow for reunification with mother due to the lack of progress that she is making on the issues that led to the children being removed.

{¶ 28} Cristin Cicco, the Director of Special Education for the Firelands Local School District, also testified. Cicco stated that the older three children are on individualized education plans and receive services through the school district. She explained that they need structure and a routine to be successful, and since engaging with

9.

school they have shown great progress. She testified that the youngest child is in a regular classroom setting and does well.

{¶ 29} The agency's final witness was Elizabeth Mertz, the guardian ad litem. Mertz testified that it was her opinion that legal custody to the maternal grandparents with visitation for mother is in the children's best interest. She cited the stability and structure provided by the maternal grandparents as a key factor in the growth of the children, noting that the children have changed "immensely" since she became involved in the case. The children also have indicated a desire to remain with the maternal grandparents and are well-bonded with them, with only one child verbally expressing that she misses mother and wishes mother would come to live with them. Mertz did not have any concerns with the maternal grandparents being able to provide long-term care and support for the children. In contrast, she is concerned that mother lacks the insight to understand how her choices have contributed to her homelessness and the impact it has had on the children.

{¶ 30} Following the hearing, the juvenile court entered its judgment entry on November 7, 2024, granting the agency's motion and awarding legal custody of the children to the maternal grandparents. It found that the agency "has made more than reasonable efforts to attempt to reunify the children with mother," but despite these efforts, mother is not in a position to have the children returned to her custody "now or in the near future." Further, it found that it is in the best interests of the children to place them in the legal custody of the maternal grandparents, noting that the children are "thriving" and "receiving the services and help they need."

10.

## II. Assignments of Error

{¶ 31} Mother timely appeals the November 7, 2024 judgment of the juvenile court, asserting two assignments of error for review:

> 1. The trial court erred by determining that Wood County Jobs and Family Services made reasonable efforts to reunify mother's children with her, when the statutory time frame for legal custody was not exhausted, and even if it was, could have been extended because the motion for legal custody was filed approximately 6 months after removal.

> 2. The trial court's judgment granting legal custody to maternal grandparents was not based on the manifest weight of the evidence, when mother had substantially completed part of her case plan services before the agency filed for legal custody, approximately six months after the removal.

## III. Analysis

{¶ 32} In her assignments of error, mother argues that the trial court erred in awarding legal custody of the children to the maternal grandparents in that the agency prematurely moved for legal custody when there was still time remaining under the statute for her to complete her services and she was demonstrating progress on those services.

{¶ 33} Mother's first assignment of error challenges the trial court's finding that the agency made reasonable efforts to reunify the children with her. This court reviews the reasonable efforts finding under a manifest weight of the evidence standard. *In re E.H.*, 2016-Ohio-8170, ¶ 23 (6th Dist.), citing *In re Er.P.*, 2014-Ohio-2831, ¶ 24-25 (6th Dist.). "In a reasonable efforts determination, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute." *Id.*, quoting *In re S.R.*, 2013-Ohio-2358, ¶ 21 (6th Dist.). "A 'reasonable

11.

effort' is an 'honest, purposeful effort, free of malice and the design to defraud or to seek an unconscionable advantage.'" *Id.*, quoting *In re S.R.* at ¶ 21, quoting *In re Weaver*, 79 Ohio App.3d 59, 63 (12th Dist. 1992).

{¶ 34} Here, mother's contention is not that the agency failed to provide services to remedy the issues that caused the children to be removed. Rather, she argues that the agency did not make reasonable efforts because it did not give her enough time to continue the progress she was making. She specifically notes that she completed the substance abuse services, and she addressed the housing element by moving into a homeless shelter and was expecting to be transferred to a different shelter when her time there expired. In addition, although she did not do follow-up mental health services through Unison where she had her assessment, she did engage in independent counseling with Elick at the Beach House. Finally, she argues that the children had only recently begun counseling through Ohio Guidestone at the time of the hearings, and additional time would have afforded an opportunity for her to repair her relationship with the older two children.

{¶ 35} At the outset, although mother is correct that under R.C. 2151.353(G) the initial award of temporary custody could last up to one year, or up to two years if a dispositional motion pursuant to R.C. 2151.415 is pending, and under R.C. 2151.353(H) the agency could seek an extension of the order of protective supervision for an additional six months beyond the first year after the case was filed, nothing in those statutes *requires* the agency to wait until the time limits have expired before moving for legal custody.

12.

{¶ 36} Furthermore, the agency in this case did make reasonable efforts to reunify the children with mother. The agency created a case plan that included substance abuse, mental health, and parenting services. The agency set up in-person visits between mother and the children, and when mother's van was repossessed, it set up phone visits. Later, it paid for mother to be transported by taxi so that she could resume visiting the children in person. It also offered to assist mother in obtaining housing closer to the children but she refused, opting instead to remain in homeless shelters with J.J. Considering these actions, the trial court's finding that the agency made reasonable efforts is not against the manifest weight of the evidence.

{¶ 37} Accordingly, mother's first assignment of error is not well-taken.

{¶ 38} In her second assignment of error, mother argues that the trial court erred when it found that legal custody to the maternal grandparents was in the children's best interest. In support, she cites the same arguments she raised in her first assignment of error, namely that she was making progress on her case plan services and time still remained on the case.

{¶ 39} "A trial court decision regarding legal custody of a child must be supported by a preponderance of the evidence." *In re S.T.*, 2025-Ohio-1379, ¶ 17 (6th Dist.), citing *In re K.S.*, 2022-Ohio-2810, ¶ 18 (6th Dist.). "A preponderance of the evidence is 'evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it.'" *Id.*, quoting *Black's Law Dictionary* (6th Ed. 1998).

{¶ 40} An appellate court reviews the trial court's order of legal custody for an abuse of discretion. *In re G.B.*, 2024-Ohio-5528, ¶ 58 (6th Dist.), citing *In re H.H.*,

13.

2024-Ohio-686, ¶ 64 (6th Dist.).  An abuse of discretion connotes that the trial court's attitude was unreasonable, arbitrary, or unconscionable.  *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 41} "To determine a child's best interest, a trial court may consider the factors set forth in R.C. 2151.414(D), R.C. 3109.04(F)(1), 'a combination of the two, or general notions of what should be considered regarding the best interests of the child.'"  *In re G.B.* at ¶ 60, quoting *In re H.H.* at ¶ 67.  Those factors include, inter alia, the children's relationships with mother and the caregivers, the wishes of the children, the need for legally secure placement, the children's adjustment to their home, school, and community, the mental and physical health of all persons involved, and the person more likely to honor and facilitate visitation rights.  *See* R.C. 2151.414(D) and 3109.04(F)(1).

{¶ 42} Here, all four children are well-bonded with their grandparents, while only two of them wish to speak with mother.  In addition, they have expressed their desire to stay with the maternal grandparents who provide a stable and structured home environment.  The children also are healthier and gaining weight again.  They are enrolled and making progress in school, where they receive appropriate support services and are engaged with the school community.  Finally, the maternal grandparents are committed to facilitating visitation with mother.  Upon consideration of these factors, the trial court did not abuse its discretion when it determined that awarding legal custody to the maternal grandparents was in the children's best interests.

{¶ 43} Accordingly, mother's second assignment of error is not well-taken.

14.

## IV. Conclusion

**{¶ 44}** For the foregoing reasons, the judgment of the Wood County Court of Common Pleas, Juvenile Division is affirmed.  Mother is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

JUDGE

Myron C. Duhart, J.

JUDGE

Charles E. Sulek, P.J.
CONCUR.

JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.