[Cite as *In re M.L.*, 2026-Ohio-2267.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re M.L.

Court of Appeals No.  {48}L-25-00269

Trial Court No.  24300398

**DECISION AND JUDGMENT**

Decided:  June 15, 2026

* * * * *

Emily McGill, for appellee.

Adam H. Houser, for appellant.

* * * * *

**OSOWIK, P.J.**

{¶ 1} We sua sponte place this appeal on the accelerated calendar under App.R. 11.1 and 6th Dist.Loc.App.R. 11.1.  This judgment entry is not an opinion of the court. *See* Rep.Op.R. 3.1; App.R. 11.1(E); 6th Dist.Loc.App.R. 11.1.

{¶ 2} In this appeal, appellant-maternal grandmother, C.B. appeals the November 13, 2025 judgment of the Lucas County Court of Common Pleas, Juvenile Division, which denied her June 10, 2024 complaint for custody of the minor child, M.L., in this case, and awarded permanent custody of that child to appellee Lucas County Children Services ("LCCS") in case No. 23296229.  For the reasons that follow, the trial court's judgment is affirmed.

{¶ 3} As a preliminary matter, the underlying facts and procedural history are entwined with a separate, but related termination case involving M.L., his mother, A.B., and his father, M.L. Appellant is A.B.'s mother and M.L.'s maternal grandmother. Appellant's brief repeatedly states that the two cases were joined and implies that she was a party to the permanency proceedings. As noted by appellee, appellant likely means to argue that the cases were consolidated and/or that she intervened as an interested party pursuant to either Juv.R. 2(BB), or Civ.R. 24(A) or (B). *See In re R.V.*, 2011-Ohio-1837, ¶ 44 (6th Dist.) (the juvenile court has the discretion to allow any other individuals to participate if their "presence is necessary to fully litigate an issue presented."); *see also In re A.B.*, 2018-Ohio-4206, ¶ 6 (6th Dist.) ("the juvenile court is required to permit an individual to intervene 'when a statute of this state confers an unconditional right to intervene' or 'the applicant claims an interest relating to * * * the subject of the action,' Civ.R. 24(A), and has discretion to allow any other party to intervene. Civ.R. 24(B).").

{¶ 4} Appellant, however, never filed a motion to intervene or a motion to consolidate the cases in the trial court, and while the court often heard the two cases at the same time, it never issued an order consolidating them. Additionally, appellant filed her appeal with only the case number for her private custody matter—she did not file a joint notice of appeal or separate notices of appeal in both cases and then move to consolidate them pursuant to App.R. 3(B). Substantively, appellant does not challenge the permanency decision despite her implications that she appealed that case in her brief. Consequently, despite some of the procedural muddling at the trial level in this case, only

2

appellant's private custody case is properly before this court, and our review is strictly limited to the trial court's denial of appellant's complaint for custody.

## I. Factual and procedural background

{¶ 5} On June 10, 2024, appellant filed a third-party complaint for custody alleging that she had "been approved as of March 5, 2024 and children service still hasn't changed custody (sic)." After several continuances and in the interest of judicial economy, the matter was set for trial on September 22 and 29, and October 15, 2025, at the same time as the permanency trial in case No. 23296229.

{¶ 6} While the cases were procedurally kept separate, the testimony was combined throughout the three-day trial. The trial opened to the case in chief of Lucas County Children Services ("LCCS") for the first and second day, then finished on the third day with the cases in chief of mother-A.B., appellant, and the guardian ad litem ("GAL").

{¶ 7} Both cases sought custody over the minor child, M.L. M.L. tested positive for cocaine and benzoylecgonine at birth and spent several weeks in the neonatal intensive care unit. After his discharge from the hospital, he was immediately placed in the custody of LCCS in September 2023. M.L. has significant medical needs and these needs were a large focus of the trial. According to the record, M.L. is diagnosed with spastic quadriplegic cerebral palsy, cutaneous mastocytosis (an autoimmune skin condition), ketosis hypoglycemia, feeding difficulty, failure to thrive, milk intolerance, and global developmental delay. Additionally, M.L. has a chromosomal abnormality that is "still being explored" and he is being evaluated for fetal alcohol syndrome.

3

{¶ 8} The majority of the testimony provided throughout the trial focused exclusively on the permanency case against A.B. and is not relevant to this appeal. Turning to the relevant testimony against appellant, on the first day of trial, LCCS had its supervisor, Rick Mendieta, testify. As part of his testimony, Mr. Mendieta testified that appellant had initially been a consideration for custody of M.L., and that a home study was initially approved in March of 2025. However, he explained that shortly after the approval, LCCS received allegations that appellant was using drugs and had two homes—which would have been contrary to her statement that she was selling one of the homes and moving permanently into the other. Mr. Mendieta explained that in response to the allegations, LCCS had appellant complete a random drug screen on May 20, 2024, and the screen came back positive for Oxycodone, cocaine, and opiates. Regarding the home issue specifically, Mr. Mendieta told the court that an allegation was made that appellant had one home that she and her children live at and another home that she uses for home study purposes but does not actually live at. Mr. Mendieta stated that in response to the allegation, a case worker and the GAL went to the home that appellant was not supposed to be living at and observed her and her children there. Mr. Mendieta concluded his testimony stating that appellant's drug test led to LCCS denying appellant's home study and told the court that LCCS did not believe that placement with appellant was in M.L.'s best interests.

{¶ 9} Appellant left before the conclusion of the first day of trial. On the second day of trial, neither A.B. nor appellant were present. A.B. initially texted her attorney stating that she overslept and later told her attorney that appellant was having medical

4

issues that she was helping with. A.B.'s attorney requested a continuance, but the continuance was denied. Appellant never contacted the court on her own behalf to explain her absence or to request a continuance.

{¶ 10} With neither A.B. nor appellant present, the court began the second day of trial and LCCS continued its case in chief. Like the first day, most of the testimony centered on A.B. and the permanency issue. Only the LCCS ongoing case worker, Constance Whaley, offered testimony regarding appellant.

{¶ 11} Ms. Whaley testified that appellant's home study was denied due to drug use and her positive test for Oxycodone, cocaine, and opiates. Ms. Whaley informed the court that appellant told LCCS—though she was allegedly not supposed to—that the reason she tested positive for cocaine was because she was an informant for the police and held a bag of cocaine with her bare hands. Ms. Whaley went on to describe her concerns with appellant's housing situation—both the condition of the house where LCCS conducted the home study, and the situation with the two houses. Ms. Whaley told the court that LCCS did not believe that placement with appellant was in M.L.'s best interests, specifically due to concerns about appellant's honesty and feelings that she is "hiding something," as well as concerns that appellant did not fully grasp how sick M.L. is.

{¶ 12} On cross-examination from A.B.'s attorney, Ms. Whaley explained that she called a Toledo Police number given to her by appellant to confirm her work as an informant for the city. She stated that she could not get ahold of the man appellant told her to talk to, but did speak with his partner. According to Ms. Whaley, the partner did

not know of appellant or why she was involved with them, but did say that he had heard her name before. Ms. Whaley admitted that there were no further attempts to verify appellant's work with the police. When asked why she did not believe that following up was important, Ms. Whaley explained that appellant's story that she was an undercover informant for the police felt "convenient" at the time after her home study was denied.

{¶ 13} In a separate cross-examination from the GAL, Ms. Whaley admitted that she did not believe that appellant tested positive for cocaine because she engaged in an undercover drug deal for the police. She further admitted that even if the undercover explanation was true, she did not believe that appellant being an undercover informant participating in drug deals was good for M.L. either.

{¶ 14} Finally on re-direct, Ms. Whaley admitted that cocaine was A.B.'s drug of choice and that it was especially concerning to LCCS that A.B.'s mother would test positive for the same substance that A.B. had a problem with.

{¶ 15} On the third and final day of trial, appellant arrived late to the hearing. The court proceeded to A.B.'s case in chief opposing the permanent custody motion and requesting that custody of M.L. be awarded to her. After A.B. rested, the court turned to appellant's third-party complaint for custody. Appellant was her sole witness and testified on her own behalf. After the conclusion of appellant's case in chief, the court returned to the testimony of the GAL. The GAL's testimony focused exclusively on the permanency issue.

{¶ 16} On October 20, 2025, the court held a hearing to announce its decision. With regard to the permanency decision in case No. 23296229, the court found that

6

LCCS had shown by clear and convincing evidence that it was in M.L.'s best interest to award permanent custody to LCCS. The court then found appellant's third-party complaint not well-taken and denied it. The court specifically noted that appellant missed more than half of the trial and explained that M.L. needed someone who was fully committed to him, particularly due to his complex medical needs, and that it did not believe that either A.B. or appellant were fully committed to those needs.

{¶ 17} Following the hearing, the court issued a written judgment entry on November 13, 2025, addressing both the termination and third-party complaint. The court found that granting LCCS permanent custody of M.L. was in his best interest. In this determination, the court considered the best interest factors of R.C. 2151.414(D)(1). More specific to the permanency decision, the court noted that M.L. was bonded with both his mother and foster family, that the GAL believed that permanent custody with LCCS is in M.L.'s best interest, and that M.L. had been in the custody of LCCS since he was released from the hospital after his birth. The court additionally found that M.L. needed a permanent environment with security, stability, and consistency that would be able to meet his medical needs. The court did not believe that his parents or placement with appellant would meet those needs.

{¶ 18} Turning to the third-party complaint, the court found that placement with appellant would not be in M.L.'s best interest, noting concerns of appellant's "untruthfulness" about where she was living, her positive drug screen for cocaine, and that she missed more than half the trial. The court could not find that appellant was committed to M.L.'s care or that she could meet his medical needs.

7

{¶ 19} Overall, the court noted that the case was statutorily out of time and that no more extensions of temporary custody would be available. As such, the court found that M.L.'s need for a legally secure permanent placement could not be achieved without the granting of permanent custody to LCCS and denying appellant's third-party complaint for custody.

{¶ 20} Appellant appealed and assigned the following errors for our review:

1. **First Assignment of Error:** The Trial Court Denied Appellant's Due Process Rights when it Failed to Allow Appellant to Cross Examine any of the Witnesses Against her or to ask any questions or meaningfully participate in the case.

2. **Second Assignment of Error:** The Trial Court's Decision was against the manifest weight of evidence.

We will address the assignments out of order.

## II. Law and analysis

### A. The trial court's decision was not an abuse of discretion

{¶ 21} Legal custody proceedings vest in the custodian the right to have physical care and control of the child, subject to any residual parental rights and responsibilities that remain intact with the birth parents. *In re C.R.*, 2006-Ohio-1191, ¶ 115. An award of legal custody is authorized by statute where a child has been adjudicated neglected, dependent, or abused. R.C. 2151.353(A)(3). "At any hearing in which a court is asked to modify or terminate an order of disposition issued under section 2151.353, 2151.415, or 2151.417 of the Revised Code, the court, in determining whether to return the child to the child's parents, shall consider whether it is in the best interest of the child." R.C. 2151.42(A).

8

{¶ 22} "An award of legal custody is significantly different than an award of permanent custody, as legal custody merely confers the right and responsibility for the care and supervision of the child, while 'residual parental rights, privileges, and responsibilities' remain intact." *Matter of A.O.*, 2025-Ohio-4923, ¶ 16 (10th Dist.), quoting R.C. 2151.011(B)(21); 2151.353(A)(3)(c). A parent retaining residual rights has "far different procedural safeguards in [a] legal-custody proceeding than those that would be afforded a parent in a permanent-custody proceeding through which parental rights could be completely terminated." *In re R.G.M.*, 2024-Ohio-2737, ¶ 17, citing R.C. 2151.011(B)(31). Because of these differences, "[a] trial court determines an award of legal custody based upon proof by a preponderance of the evidence." *In re K.S.*, 2022-Ohio-2810, ¶18 (6th Dist.), citing *In re Nice*, 141 Ohio App. 3d 445, 455 (7th Dist. 2001). This is a lower standard than the clear and convincing burden of proof used by trial courts in permanent custody proceedings. *In re Nice* at 455. It is well settled that "a preponderance of evidence means the greater weight of evidence[,]" and that "[t]he greater weight may be infinitesimal, and it is only necessary that it be sufficient to destroy the equilibrium." *Travelers' Ins. Co. v. Gath*, 118 Ohio St. 257, 261 (1928).

{¶ 23} This court reviews legal custody decisions for an abuse of discretion. *See In re S.L.*, 2025-Ohio-4608, ¶ 40 (6th Dist.); *In re A.B.*, 2018-Ohio-4206, at ¶ 12 (6th Dist.); *In re K.V.*, 2012-Ohio-190, ¶ 19 (6th Dist.).[1] An abuse of discretion connotes that the trial

---

[1] The Supreme Court of Ohio found that appellate courts must review *permanent* custody decisions using a manifest weight standard of review. *In re Z.C.*, 2023-Ohio-4703, ¶ 11. In making this finding, the Supreme Court rejected the abuse of discretion standard of review in those specific cases involving the clear-and-convincing burden of proof. *Id.* at ¶

9

court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). Because custody determinations "are some of the most difficult and agonizing decisions a trial judge must make," a trial judge must have broad discretion in considering all of the evidence. *Davis v. Flickinger*, 77 Ohio St.3d 415, 418 (1997).

{¶ 24} "The trial court's decision to grant legal custody to a relative or other interested individual under R.C. 2151.415(A)(3) must be 'in accordance with the best interest of the child as supported by the evidence.'" *Matter of A.O.*, 2025-Ohio-4923, at ¶ 19 (10th Dist.), quoting R.C. 2151.415(B). Therefore, "[f]ollowing a dependency adjudication and a disposition awarding temporary custody to an agency, a trial court's decision to grant legal custody of the child to anyone—parent or nonparent—is based solely on the best interest of the child." *Id.*, citing *In re Z.M.*, 2021-Ohio-3744, ¶ 30 (10th Dist.); R.C. 2151.415(B); R.C. 2151.42(A) ("At any hearing in which a court is asked to modify or terminate an order of disposition … the court, in determining whether to return the child to the child's parents, shall consider whether it is in the best interest of the child.").

---

18. Notably, however, the court declined to extend its holding to non-permanent custody decisions that involve lesser burdens of proof. *See id.* at ¶ 12. As a result, there is a split amongst appellate courts on whether to use an abuse of discretion standard or a manifest weight standard when reviewing *legal* custody decisions. *See e.g., Matter of A.O.*, 2025-Ohio-4923, ¶ 17-18 (10th Dist.). Historically, however, "in the context of juvenile legal custody determinations, the trial court's award of legal custody has traditionally been subject to an abuse-of-discretion standard of review." *Id.* at ¶ 17, citing *In re Gales*, 2003-Ohio-6309, ¶ 12 (10th Dist.); *In re Z.M.*, 2021-Ohio-3744, ¶ 33 (10th Dist.).

10

{¶ 25} Notably, however, the General Assembly did not specify the factors to be considered for legal custody as it did for other dispositional orders. The absence of a specific requirement to consider statutory factors of best interest may be due to the fact that legal custody is not as extreme as an award of permanent custody. *See In re C.R.*, 2006-Ohio-1191, ¶ 17. Therefore, we must presume the juvenile court is free to consider any best interest factors it deems appropriate. *In re A.B.*, 2018-Ohio-4206, at ¶ 11 (6th Dist.), citing *In re G.M.*, 2011-Ohio-4090, ¶ 15-16 (8th Dist.).

{¶ 26} Relevant to this appeal, the trial court used the R.C. 2151.414(D)(1) best interest test which instructs the trial court to consider a non-exhaustive list of factors when determining the best interest of the child, which include:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.

> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 27} Here, appellant argues that the trial court acted unreasonably and arbitrarily by failing to place M.L. with the least restrictive placement—a family member—and more specifically, herself. Appellant believes that because she has other children in the

11

home, has an excuse for testing positive for cocaine through her work as a confidential informant, has a stable home with a place for M.L. to sleep, understands M.L.'s medical needs, and is able to get M.L. to and from appointments, placement with her was the least restrictive option.

{¶ 28} Upon review, we find ample evidence to support the trial court's best interest findings. While appellant is correct that generally, placement with a relative is preferred, appellant was removed from consideration after failing her home study. The record establishes that the trial court, in determining the best interest of M.L., clearly considered appellant's concerns. In its final judgment, in addition to explaining why permanent custody with LCCS was in M.L.'s best interest, the trial court specifically explained why placing M.L. with appellant was *not* in his best interest—citing to appellant's drug screen, her untruthfulness to the court about her living situation, and her lack of commitment to M.L. by failing to show up to the trial. Therefore, the trial court did not abuse its discretion when it denied appellant's third-party complaint for custody.

{¶ 29} Accordingly, appellant's second assignment of error is not well-taken.

**B. The trial court did not deprive appellant of due process**

{¶ 30} In her first assignment of error, appellant argues that because the trial court "joined" her private third-party complaint for legal custody with the permanency proceedings, she was entitled to actively participate in the trial and therefore, when she was not given the opportunity to cross-examine the witnesses against her, her due process rights were violated.

{¶ 31} First, as previously noted, appellant's third-party complaint was never "joined" (or more accurately, consolidated) with the permanency hearing, nor was she made a party to the permanency case through intervention. While some of appellant's confusion in this case is understandable given that she was acting pro se and the trial court heard the two cases at the same time, the two cases were never consolidated by the court and appellant never sought to consolidate the two cases on appeal. As such, while the choices that the trial court made while navigating the two cases are not ones that promote procedural clarity, only the legal custody matter is before this court.

{¶ 32} Turning now to appellant's argument that her due process rights were violated, we note that legal custody proceedings offer "far different procedural safeguards … than those that would be afforded a parent in a permanent-custody proceeding through which parental rights could be completely terminated." *In re R.G.M.*, 2024-Ohio-2737, at ¶ 17, citing R.C. 2151.011(B)(31).

{¶ 33} Appellant is correct that she did not cross-examine any witnesses during the three-day trial. Relevant to this analysis, however, at no point during the three-day trial did appellant ask or attempt to cross-examine any of the individuals who testified against her. Furthermore, she missed approximately half of the trial without explanation. Under these circumstances, while this court would already review appellant's due process allegations with less scrutiny compared to a permanent custody matter, we believe that appellant has forfeited the right to argue on appeal that the trial court violated her due-process when it "failed to allow appellant to cross examine any of the witnesses."

13

{¶ 34} "The failure to object to an error at a time when the court could have avoided or corrected the error means that the appellant forfeits the right to raise the issue on appeal." *Matter of K.C.*, 2023-Ohio-4118, ¶ 35 (4th Dist.), citing *Independence v. Office of the Cuyahoga Cty. Executive*, 2014-Ohio-4650, ¶ 30. It is a well-established rule of appellate procedure that "'an appellate court will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court.'" *State v. Quarterman*, 2014-Ohio-4034, ¶ 15, quoting *State v. Childs*, 14 Ohio St.2d 56 (1968), paragraph three of the syllabus.

{¶ 35} Appellate courts do, however, have discretion to consider forfeited errors and review them for plain error. *Quarterman* at ¶ 16. However, the plain-error doctrine is not readily invoked in civil cases. *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121 (1997). Because of this, the Supreme Court of Ohio has set a "very high standard" for invoking the plain-error doctrine in a civil case. *See Perez v. Falls Financial, Inc.*, 87 Ohio St.3d 371, 375 (2000), citing *Goldfuss* at syllabus. As such, our review is sharply limited to "the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss* at 122-123.

{¶ 36} In the case before us, we do not believe that the trial court plainly erred when it failed to invite appellant to cross-examine any of the witnesses.

14

**{¶ 37}** First, there is nothing in the record to suggest that appellant was *prevented* from questioning the LCCS witnesses. As noted above, only two witnesses—the LCCS supervisor on day one of trial and the ongoing caseworker on day two—testified with statements against appellant. While it is unclear from the record whether appellant was present for the day one witness, we know that appellant was not present on day two without explanation. Furthermore, even when appellant was present at trial, she never objected to or raised the issue of cross-examination. Accordingly, there is nothing in the record to suggest that appellant was prevented by the court from cross-examining, and therefore, any failure to cross-examine was done so by her own choices. *See In re R.G.M.*, 2024-Ohio-2737, at ¶ 24; *see contra In re Hoffman*, 2002-Ohio-5368, at ¶ 24 (in a permanent custody proceeding, it was reversible error where the trial court *refused* to allow the mother of the child whose permanent custody at was at issue to call the GAL.).

**{¶ 38}** Second, as determined above, the trial court did not abuse its discretion in denying appellant's motion for legal custody. In making that decision, the trial court considered evidence such as appellant's positive drug screen, M.L.'s medical records, and appellant's own testimony. Notably, appellant did not present any evidence to the court, nor did she bring any other witnesses besides herself. During her own testimony, appellant provided explanations for some of the allegations against her—that she was employed through Lucas County Narcotics which was how her drug screen for cocaine came back positive, that she is prescribed Oxycodone, and that the allegations about her drug use and housing situation were made by her daughter's father and the young daughter of a family friend after she turned in the runaway teenager.

15

**{¶ 39}** With this information, even if the court erred by not inviting appellant to cross-examine the other witnesses—and this court cannot say that it did—because it had extensive evidence and testimony to consider when deciding if placing M.L. with appellant was in M.L.'s best interest, any error did not seriously affect "the basic fairness, integrity, or public reputation of the judicial process." *Goldfuss* at 123. As such, appellant has not met the very high standard for invoking the plain-error doctrine.

**{¶ 40}** Accordingly, appellant's first assignment of error is not well-taken.

### III. Conclusion

**{¶ 41}** For the foregoing reasons, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Appellant is ordered to pay the court costs of this appeal pursuant to App. R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.


Thomas J. Osowik, P.J.

_____
JUDGE

Myron C. Duhart, J.
CONCUR.

_____
JUDGE

Gene A. Zmuda, J.
CONCURS IN JUDGMENT
ONLY.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.